**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

CITY OF ALBUQUERQUE,

        Plaintiff,

v.                                                                    No. 1:21-cv-00349-JHR-GJF

THE SEGAL COMPANY (Western States), a
Maryland Corporation d/b/a Segal Consulting.

        Defendant.

**PLAINTIFF'S OPPOSED[1] MOTION FOR PARTIAL SUMMARY JUDGMENT ON LIABILITY**

Pursuant to FED. R. CIV. P. 56, Plaintiff the City of Albuquerque (the "City") asks this Court to grant partial summary judgment that the Segal Company ("Segal") is liable for breach of contract and negligent misrepresentation. Segal used incomplete data in presentations to the City regarding whether the City should switch to a self-insured health benefits plan. The data understated the pharmacy costs of a self-insured plan by millions of dollars, causing the City to decide to switch to a self-insured plan in order to obtain those pharmacy savings. But the City did not obtain the pharmacy savings promised by Segal. For the reasons set forth below, the undisputed facts show that Segal is liable for breach of contract and for negligent misrepresentation.

## I.      INTRODUCTION

This case arises out of the City's relationship with the Segal Company, a consulting firm. The City contracted with Segal to provide consulting services regarding employee health benefits.

---

[1] Pursuant to D.N.M. LR-Civ 7.1(a), the City sought Segal's concurrence on this motion, which was denied.

A key question that the City asked Segal to help it with was whether it should switch from a fully-insured model (where the insurer took on all of the risk) to a self-insured model (where the City took on the risk). Initially, Segal employee Gary Petersen was the lead consultant advising the City; in mid-2019 he was retiring and was being replaced by another Segal employee, Nura Patani. Before his retirement both Petersen and Patani made a presentation to the City regarding the comparative costs and benefits of transitioning to a self-insured model.

To assist the City with the decision of whether to self-insure, Segal prepared a comparison of projected expenses:

| Projected Expenses | Presbyterian Health Plan/ESI | | Presbyterian Health Plan | |
|---|---|---|---|---|
| Retention | $ | 4,048,559 | $ | 8,678,956 |
| Wellness | $ | 94,002 | | Included |
| PBM & Stop Loss Integration Expense | $ | 55,104 | $ | - |
| Gym Membership | $ | 1,102,090 | | Included |
| Mobile Clinic Capitation | $ | 891,396 | | Included |
| Pooling/Stop Loss Fees (1) | $ | 2,626,377 | $ | 2,626,377 |
| Total Non-Claims Cost | $ | 8,817,527 | $ | 11,305,332 |
| Unidentified Costs | $ | - | $ | 353 |
| **Claims Cost** | | | | |
| Medical Claims | $ | 57,607,682 | $ | 57,607,682 |
| Rx Claims (2) | $ | 4,600,600 | $ | 10,891,238 |
| Total Claims Cost | $ | 62,208,282 | $ | 68,498,920 |
| **Total Annual Expense** | $ | 71,025,809 | $ | 79,804,606 |

(1) For illustrative purposes, Stop Loss for Self-Funded is estimated based on Presbyterian's quote for pooling at a $420,000 attachment point. These fees will need to be sent to market by Risk Management to develop final options.

(2) Fully Insured Rx Claims are based on Claims Component of Fully Insured Rates, Self Funded Rx Claims are net of projected rebates based on Segal analysis of ESI RFP responses, and assumes all rebates will be deposited into the Health Plan fund.

*See* Summary of Cost Analysis for Effective Dates of July 1, 2019 – June 30, 2020 (the "Summary") (attached hereto as **Exhibit A**). In the Summary, the left column indicates Segal's projections for a self-insured plan where Presbyterian is the third-party administrator and Express

Scripts (ESI) is the pharmacy benefits manager ("PBM"). The right column indicates the projections for a fully-insured plan with Presbyterian as the insurer.

The Summary projected a total FY20 savings of $8.8M in the Total Annual Expense row, about $6.2M of which came from the line item for prescription claims. The savings in this category reflects the fact that there are significant rebates available for prescription drugs from the pharmacy companies. In a-fully insured model, the insurer typically would not pass those rebates on to the City; however, in a self-insured model, the City would be able to keep those rebates for itself. The $4.6 million projection was characterized solely as net cost after rebates in Exhibit A—there were no warnings that it was not a complete projection or that it could only be used for certain purposes. The availability of the rebates is a major difference between the fully-insured and self-insured models, one that the City did not fully appreciate before retaining Segal to guide it through this process.

Segal, through Petersen and Patani, presented the Summary to the City's Chief Financial Officer, Sanjay Bhakta, in a meeting on February 15, 2019. At the meeting, Mr. Bhakta was skeptical of the projected savings for prescription benefits. Segal's employees Mr. Petersen and Ms. Patani, who are both actuaries, assured him that those savings were a reasonable estimate because of the rebates the City would receive. Based largely on those projected savings, Mr. Bhakta concluded that the City should switch to a self-insured plan. The City made that transition in July 2019.

Unfortunately, Segal had made an error in the Summary that caused the projected savings for prescription drugs set forth in the Summary to be vastly overstated. Rather than calculating an accurate number for the self-insured prescription claims, Segal reused a $4.6M projection it had

3

previously made in advising the City on which PBM to select. Because the PBM bid responses

were not directly comparable, Segal had generated numbers for each respondent to the RFP based

on a subset of the data provided so that the City could make an "apples to apples" comparison:

| Channel | Current Terms | Proposed Terms | | | |
|---|---|---|---|---|---|
| | Presbyterian | ESI | MedImpact | Presbyterian | RxBenefits-CVS |
| Retail Drug Costs | $6,872,000 | $7,163,600 | $7,104,200 | $6,960,100 | $7,332,400 |
| Mail Order Drug Costs | $107,600 | $115,300 | $116,200 | $112,300 | $115,100 |
| Specialty Drug Costs | $2,198,200 | $2,318,900 | $2,309,900 | $2,301,600 | $2,360,000 |
| Gross Cost | $9,177,800 | $9,597,800 | $9,530,300 | $9,374,000 | $9,807,500 |
| Member Cost | $638,400 | $638,400 | $638,400 | $638,400 | $638,400 |
| **Cost to Plan Before Rebates** | **$8,539,400** | $8,959,400 | $8,891,900 | $8,735,600 | $9,169,100 |
| Savings/(Cost) From Current | | ($420,000) | ($352,500) | ($196,200) | ($629,700) |
| Percent Change From Current Plan | | 4.92% | 4.13% | 2.30% | 7.37% |
| Rank | | 3 | 2 | 1 | 4 |
| Retail Rebates | 0 | $4,254,400 | $3,258,900 | $2,661,900 | $2,796,200 |
| Mail Order Rebates | 0 | $53,600 | $41,100 | $30,900 | $36,000 |
| Specialty Rebates | 0 | $50,800 | $417,100 | $395,500 | $349,700 |
| Total Projected Rebates | 0 | $4,358,800 | $3,717,100 | $3,088,300 | $3,181,900 |
| **Cost to Plan After Rebates** | **$8,539,400** | **$4,600,600** | **$5,174,800** | **$5,647,300** | **$5,987,200** |
| **Savings/(Cost) From Current** | | **$3,938,800** | **$3,364,600** | **$2,892,100** | **$2,552,200** |
| **Percent Change From Current** | | **46.1%** | **39.4%** | **33.9%** | **29.9%** |
| **Rank** | | **1** | **2** | **3** | **4** |

- **Experience period:** 7/01/17- 6/30/18. Cost and Utilization exclude specialty, compound, OTC, and paper claims. Projected generic dispensing rate (GDR) increases are applied in all years of the projection. Current achieved terms do not include guaranteed generic dispensing rates, clinical program costs or implementation credit allowances, if applicable. Financial guarantees may be adjusted for caveats made in the minimum contractual requirements.

*See* Proposal Evaluation and Results Presentation at 7 (attached hereto as **Exhibit B**).[2] As the note

beneath the chart explains, these numbers excluded a variety of the prescription drug claims. In

other words, Segal had deliberately reduced the prescription drug expenses to facilitate an "apples

to apples" comparison of the respondents. Based on these numbers, Segal ranked ESI as the top

PBM vendor. In particular, ESI's net prescription benefits cost of $4,600,600[3] was expected to

save $3,938,800 when compared to Presbyterian's current terms as the incumbent provider of

---

[2] Because the exhibit is difficult to read, this inline version has been reproduced for clarity. Exhibit B is a true and correct copy of the document produced by Segal.
[3] For brevity, this amount is rounded and abbreviated as $4.6M in this motion. Where detail is not necessary, other numbers have been similarly rounded and abbreviated (e.g., $6M is six million dollars).

pharmacy benefits. In addition to the footnote describing the limitations on the data, the chart contained a thorough set of disclaimers:

> The projections in this report are estimates of future costs and are based on information available to Segal Consulting at the time the projections were made. Segal Consulting has not audited the information provided. Projections are not a guarantee of future results. Actual experience may differ due to, but not limited to, such variables as changes in the regulatory environment, local market pressure, trend rates, and claims volatility. The accuracy and reliability of projections decrease as the projection period increases.

*See* Ex. B at 7.

Despite the fact that Segal omitted certain costs and had not adjusted the projections for cost or enrollment trends from FY18 to FY20, Segal used its $4.6M ESI estimate from the PBM selection process as its projection for the cost of self-insured prescription claims in the Summary. That number was about $6M less than the projected fully-insured cost and represented most of the approximately $8.8M savings Segal projected would result from a switch to a self-insured model. Unlike the PBM bid analysis, however, the Summary contained no warnings or disclaimers. To the contrary—Petersen reassured the City at the February 15, 2019 meeting that it was a reliable number. But it was not. The City rolled out the self-insured plan relying on the data provided in the Summary to set its budget and to determine its acceptable level of premium increases for the year. The first year's premium increase was set at 3.5%.

As the self-insured plan rolled out in FY20, it quickly became obvious that the $4.6M projection significantly underestimated the prescription costs. This reality prompted Segal to compute (for the first time) what it believed the prescription costs should actually be for FY20. That number was more than twice what Segal had told the City to expect. But the correction came too late—the City had already made the switch and had set premium increases in reliance upon the

inaccurate prescription cost projections. But for the inaccurate projections the City would have increased its premiums by at least 7%. Because of Segal's errors, the City collected less in premiums than it would have, and because its savings were less than projected, the City did not realize the projected savings related to the prescription drug claims and has had to raise premiums more than it otherwise would have in the subsequent years, harming both the City and its employees.

## II.   STATEMENT OF UNDISPUTED MATERIAL FACTS

1.  The City and Segal entered into a contract (the "Agreement") under which Segal agreed to provide broker/consultant services for the City's employee health benefits. (Ex. N, Agreement, at 19986).

2.  Incorporated into the Agreement was the Request for Proposals (RFP) No. 15-59[4] (Exhibit A to Agreement) and Segal's response to the RFP (Exhibit B to Agreement) (Ex. N at 19994 and 20027).

3.  In the Agreement Segal agreed to perform its services "in a satisfactory and proper manner, as determined by the City." (*Id.* at 19986).

4.  In the Agreement Segal warranted that its services:

    a.   were of a quality to pass without objection in the trade under the Contract description;

    b.   were fit for the intended purposes for which the services are used;

---

[4] RFP 15-59 was promulgated by 1Government Procurement Alliance (a non-profit governmental purchasing cooperative) on behalf of a variety of governmental entities, including the City.

c.   conformed to the written promises or affirmations of fact made by Segal. (*Id.* at 20006).

5.   Segal agreed to assist with the development and evaluation of a RFP for employee benefits, to prepare a detailed written report analyzing all proposals received, and to review and analyze premium rates and make recommendations to contain costs.  (*Id.* at 20014).

6.   One of the topics on which Segal advised the City was whether to switch its health benefits plan from a fully-insured to a self-insured plan. (Compl. ¶ 8; Ex. C, Ward Tr. at 37:16-20; Ex. D, Sherman Tr. at 17)

7.   In performing its consulting services, Segal had a duty to base its recommendations on current data and to take into consideration any limitations in that data. Segal also had a duty to communicate its recommendations appropriately given the circumstances and the intended users. Finally, it had a duty to use appropriate internal review procedures to ensure the accuracy of its recommendations. (Ex. E, DeWeese Report at 8-9).

8.   On February 7, 2019, Segal provided the City with a comparison of the costs of the vendors who had submitted bids to become the City's PBM. (*See* Ex. B). In order to meaningfully compare vendors, Segal omitted certain costs, such as specialty drugs, from the numbers in this presentation. (*See id.* at 7) Costs were estimated based on claims data from 7/1/2017 to 6/30/2018. (*Id.*)

9.   The presentation identified ESI as the highest ranked and lowest cost vendor, with a net cost of $4,600,600 after rebates. (*Id.*) Segal included extensive warnings and disclaimers with these numbers. (*Id.*)

10. On Feb. 11, 2019, Segal provided the City with a "Summary of Cost Analysis for Effective Dates of July 1, 2019 – June 30, 2020." (Ex. A). The purpose of the Summary was to compare the value of going self-funded to remaining fully insured for FY20. (Ex. C, Ward Tr. at 59:19-25, 73:7-12)

11. The Summary projected that the FY20 prescription claims costs would be $4,600,600 under the self-funded plan and $10,891,238 under the fully insured arrangement, a difference of over $6.2M. (Ex. A at 2.) It projected a total savings of about $8.8M under the self-funded plan. (*Id.*)

| Projected Expenses | Presbyterian Health Plan/ESI | | Presbyterian Health Plan | |
|---|---|---|---|---|
| Retention | $ | 4,048,559 | $ | 8,678,956 |
| Wellness | $ | 94,002 | Included | |
| PBM & Stop Loss Integration Expense | $ | 55,104 | $ | - |
| Gym Membership | $ | 1,102,090 | Included | |
| Mobile Clinic Capitation | $ | 891,396 | Included | |
| Pooling/Stop Loss Fees (1) | $ | 2,626,377 | $ | 2,626,377 |
| Total Non-Claims Cost | $ | 8,817,527 | $ | 11,305,332 |
| Unidentified Costs | $ | - | $ | 353 |
| **Claims Cost** | | | | |
| Medical Claims | $ | 57,607,682 | $ | 57,607,682 |
| Rx Claims (2) | $ | 4,600,600 | $ | 10,891,238 |

Ex. A at 2 (emphasis added).

12. Segal had not performed an independent projection to calculate the $4,600,600 number included in the Summary, but instead had simply recycled the number it had computed for ESI in its comparison of the PBM bids. (Ex. A at 1.) In doing so, it did not add back the previously removed costs (removed by Segal). (Ex. D, Sherman Tr. at 88-89; Ex. E, DeWeese Report at 4.)

13. Although Segal had an internal review process that required at least three people to look at work product before it was given to a client, (Ex. D, Sherman Tr. at 65:2-9; Ex. F, Henry

Tr. at 33:16-35:9) that process was not followed with respect to the Summary. (Ex. G, Petersen Tr. at 77:5-11; Ex. H, Patani Tr. at 25:20-23).

14. The Summary did not contain any disclaimers, warnings, or limitations as to what the projected expenses in it could be used for. (*See* Ex. B).

15. On February 13, 2019, Segal employee Carole Henry reviewed projections that the City had made using the incorrect $4.6M projection and responded that they were "in line with expectations." (Ex. O, 2/13/2019 email from C. Henry to M. Saiz).

16. On February 15, 2019, Segal employees Peterson and Patani met with Mr. Bhakta and Mr. Saiz to explain the Summary. Mr. Bhakta asked Segal about the large difference between prescription costs for fully-insured versus self-insured and asked how the self-insured costs could be so low. (Ex. I, Bhakta Tr. at 116:15-21, 200:16-201:4) Segal responded that the difference was explained by the fact that under the self-insured plan, the City would be getting the rebates. (*Id.* at 117:1-6; 200:23-201:4)

17. As Segal now admits, the $4,600,600 projection was incorrect:

> **ANSWER**: Segal admits that in February 2020 it advised that City that a document that was attached to a February 11, 2019 email that Segal sent to the City included one incorrect data field that related to the projected prescription drug claims for the future period July 1, 2019 through June 30, 2020.  Segal denies the remaining allegations in Paragraph 31.

(Answer ¶ 31; *see also id.* ¶ 34; Ex. D, Sherman Tr. at 45:3-14; 89:5-7; Ex. C, Ward Tr. at 25:17-22, 74:18-75:4; Ex. J, 2/10/20 Patani Email (describing the $4.6M number as understated)). Segal's own employee called the Summary "sloppy." (Ex. F, Henry Tr. at 134) In a January 27, 2020 email, Ms. Patani, the lead consultant to the City, expressed

"frustration" about the projections she and Mr. Petersen had presented to the City, instructing her team to "be careful about how we talk about things our predecessors did that we might have done differently ... ." (Ex. K, 1/27/2020 Patani Email)

18. On or around July 1, 2019, the City switched from a fully-insured to a self-insured plan. (Ex. C, Ward Tr. at 46:16-17)

19. The most important factor in the City's decision to change to self-insured was the savings attributable to prescription claims, which was based on the incorrect $4.6M estimate in the Summary. (Ex. I, Bhakta Tr. at 31:2-18, 198:5-9, 201; Ex. L, Rivera Tr. at 92.)

20. Subsequently, in September 2019, Segal provided a revised set of projections to the City for FY20.[5] The revised projections estimated the prescription costs for FY20 at $12,814,269 with rebates of $2,179,400, for a total of $10,634,869 net of rebates. (Ex. M, FY20-22 Projection) This estimate was $6,034,269 more than the $4.6M projected prescription costs net of rebates for FY20 presented to the CFO in February 2019.

21. The City used Segal's incorrect $4.6M projection to develop the cost premium projections to arrive at a 3.5% premium increase for FY20. (Ex. L, Rivera Tr. at 91:17-18.)

22. The City pays 80% of the premiums for its employees. (Ex. I, Bhakta Tr. at 39:18-22) In addition, other entities also participate in the City's health benefits plan. (*Id.* at 39:23-40:4) When the premiums are increased, both the employees, the City, and the other participating entities bear that cost. (*Id.* at 207:19-21)

---

[5] The City's fiscal years are as follows: FY20: July 1, 2019-June 30, 2020; FY21: July 1, 2020-June 30, 2021; FY22: July 1, 2021-June 30, 2022; and FY23: July 1, 2022-June 30, 2023.

23. But for the incorrect estimate, the City might never have chosen to self-insure. (Ex. I, Bhakta Tr. at 30:22-31:6) As a result of the incorrect estimate, the City had to raise premiums in subsequent fiscal years more than it expected to when it decided to switch funding systems based on the Summary and more than it would have had to raise them had it remained fully insured. (Ex. E, DeWeese Report at 9-10; Ex. I, Bhakta Tr. at 206-08)

24. Had the $4.6M number been correct, the City would have been able to use the approximately $6M per year in extra funds to build its reserve and would have had the ability to avoid increasing the premiums in later years. (Ex. I, Bhakta Tr. at 206-08).

25. Had the City been provided accurate projected prescription costs, it would have established an initial premium increase of at least 7%, which would have resulted in additional monies in the reserve at the end of FY20. (*Id.* at 210:19-22; *see also* Ex. P, 3/13/19 email from T. Rivera to S. Bhakta).

### III.   SUMMARY JUDGMENT STANDARD

Under Rule 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] . . . which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant meets this burden, the nonmovant is required to put in the record facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-52 (1986). The non-movant "may not rest on its pleadings, but must bring forward specific facts showing a genuine issue for trial as to those

dispositive matters for which it carries the burden of proof." *Kannady v. City of Kiowa*, 590 F.3d 1611, 1169 (10th Cir. 2010) (internal quotation marks and citation omitted). Nor may the non-movant "satisfy her rebuttal burden under Rule 56 by relying upon conclusory allegations, improbable inferences, and unsupported speculation." *Laurin v. Providence Hosp.*, 150 F.3d 52, 59 (1st Cir. 1998).

## IV.   THE CITY IS ENTITLED TO JUDGEMENT AS A MATTER OF LAW THAT SEGAL IS LIABLE UNDER COUNTS ONE AND TWO

Counts one and two of the City's complaint against Segal are for breach of contract and negligent misrepresentation, respectively. Given the undisputed facts above, the City is entitled to judgment as a matter of law that Segal is liable for both counts.

### A.   Segal Is Liable for Breach of Contract

To prove its breach of contract claim, the City must show (1) the existence of a contract, (2) breach, and (3) damages.[6] *See, e.g.*, *Am. Mech. Sols., LLC v. Northland Process Piping*, 184 F. Supp. 3d 1030, 1067 (D.N.M. 2016). In addition, New Mexico recognizes an implied warranty to use reasonable skill in performing a contract. *See State ex rel. Risk Mgmt. Div. v. Gathman-Matotan Architects*, 1982-NMCA-130, ¶¶ 9-11, 98 N.M. 790.[7] Finally, parties to a contract have a duty of good faith and fair dealing with respect to the performance of the contract. *See, e.g.*, *Sanders v. FedEx Ground Package Sys.*, 2008-NMSC-040, ¶ 7, 144 N.M. 449. Here, there is no dispute that a contract existed between the parties. (UMF 1) As explained next, Segal breached the

---

[6] As discussed below, because this motion seeks partial summary judgment as to liability only, it does not attempt to prove an exact amount of damages, only that the City has been damaged.

[7] Because this case falls within the Court's diversity jurisdiction, the substantive law of New Mexico applies. *See, e.g.*, *Specialty Beverages, L.L.C. v. Pabst Brewing Co.*, 537 F.3d 1165, 1175 (10th Cir. 2008).

express terms of the contract, failed to exercise the skill of a reasonably qualified health benefits consultant, and failed to perform its obligations in good faith.

### 1.       *Segal Breached the Implied Warranty to Use Reasonable Skill*

New Mexico implies in every contract a warranty that the contracted-for services will be rendered in conformity to the standard of care within the profession or trade. *See Gathman-Matotan*, 1982-NMCA-130, ¶¶ 9-11. As with a claim for negligence, the plaintiff must prove that the defendant failed to exercise the knowledge, care, and skill of a reasonably well-qualified professional practicing under similar circumstances. *See Adobe Masters, Inc. v. Downey*, 1994-NMSC-101, ¶ 3, 118 N.M. 547. The City alleges that Segal breached this implied warranty by, among other things, failing to use the correct data to project the prescription drug costs for FY20. Compl. ¶ 39.

The requirements of proof for a breach of the implied warranty are similar to a cause of action in tort negligence. *See Gathman-Matotan*, 1982-NMSC-430, ¶ 11. Thus, the City must prove duty, breach, causation, and damages to prevail on this claim. Here, as described above, Segal's duty was to exercise the skill and care of a reasonably well qualified professional under similar circumstances. *See Adobe Masters*, 1994-NMSC-101, ¶ 3. The exact scope of this duty must be shown by expert testimony. *See id.* ¶ 9.

The City's expert, Charles C. DeWeese, described the applicable standard of care.  The American Academy of Actuaries publishes Actuarial Standards of Practice ("ASOPs") which provide guidance for actuaries such as Petersen and Patani. Among other things, the ASOPs require actuaries to base their conclusions on current data and to be mindful of any limitations to that data. (UMF 7)   In addition, an actuary should ensure that the form and content of his

communications are appropriate to the circumstances and take into account the intended users. (*Id.*) Finally, consulting firms should subject client work product to an internal review process, and that process should be rigorously documented. (*Id.*)

The undisputed facts show that Segal breached these duties. First and foremost, Segal did not use the requisite level of skill and care when it included the $4.6M number from the PBM evaluation in the Summary. The $4.6M number was based on partial data from 2018. (UMF 8) Segal did not update that data and did not add back in the amounts it had removed for the PBM selection process. (UMF 12) As a result, the number necessarily understated the projected prescription claim expenses for FY20. Despite this, Segal told Mr. Bhakta that the $4.6M number was, in fact, the projected claims expense for FY20. And Segal was aware when it did so that the City was relying on the projection to decide whether to self-insure. (UMF 15)

Second, Segal did not use the requisite level of skill and care in communicating this information to the City. Unlike the bid analysis, which a contained disclaimer, the Summary contained no warnings that it could not be relied on. (UMF 14) The Summary was intended to help the City choose between a self-insured and a fully insured model, and there was no indication that it was not fit for that purpose. (UMFs 10, 14) In addition, Segal further confirmed the reliability of the number when pressed about it by Mr. Bhakta at the February 15, 2019 meeting. (UMF 16)

Third, Segal failed to exercise the required level of skill and care by failing to carry out and document any review process on the data it presented to the City. According to Segal, its practice was to use an internal review process where at least three people would look at any work product before it was sent to the client. (UMF 13) That review process is also the applicable standard of care in this industry. (UMF 7) But none of Segal's employees could say that that

process was followed with respect to the Summary. (UMF 13) Because of this breakdown in the review process, Segal presented the City with an incorrect number that had not been properly vetted to use for making the decision of whether to switch to a self-insured model. (UMFs 11, 17)

As a sophisticated consultant, Segal had a duty to ensure that the information it gave the City could be relied on or, failing that, to clearly communicate to the City any limitations. Instead, it cut-and-pasted an incorrect number and passed it off as a correct projection of prescription claims expenses. By doing so, it breached the implied warranty to use reasonable skill.

### 2.    *Segal Breached the Terms of the Contract*

It is undisputed that a contract existed between Segal and the City. (UMF 1) Under the Agreement, Segal promised that it would perform the services "in a satisfactory and proper manner, as determined by the City." (UMF 3) In addition, it promised that its Services would be "fit for the intended purposes for which" they were to be used. (UMF 4) The undisputed facts show that Segal breached both of those promises.

Like the warranty to use reasonable skill, these promises essentially required Segal to perform the contracted for services in a competent manner. With regards to the flawed $4.6M projection in the Summary, Segal failed to act in a "satisfactory and proper" manner because, as described above, it (1) knew that the projection was inaccurate (UMF 17), it (2) failed to explain the limitations of the projection (UMF 14) and even affirmatively stated that the inaccurate projection was reliable (UMF 16), and (3) it chose not to do the work necessary to calculate an accurate number to include in the Summary (UMF 12). Similarly, under its own quality standards it knew that in order to perform its work satisfactorily and properly, it needed to perform a three-part review. (UMF 13) Yet it elected not to do so. Moreover, it knew the purpose the Summary

would be used for—to choose between a self-insured and a fully-insured model—yet Segal delivered a Summary containing a projection that it admits was wrong and encouraged the City to use that wrong number to make its decision.

### 3.      Segal Breached the Covenant of Good Faith and Fair Dealing

Count 1 also alleges that Segal breached the covenant of good faith and fair dealing. Compl. at 5. Every contract in New Mexico imposes on the parties a duty of good faith and fair dealing in the performance of the contract. *Continental Potash, Inc. v. Freeport-McMoran, Inc.*, 1993-NMSC-039, ¶ 64, 115 N.M. 690. The covenant "requires that neither party do anything that will injure the rights of the other to receive the benefit of their agreement." *Bourgeous v. Horizon Healthcare Corp.*, 1994-NMSC-038, ¶ 16, 117 N.M. 434; *see also* UJI 13-832 NMRA ("The implied promise is breached only when a party seeks to prevent the contract's performance or to withhold the contract's benefits from the other party."). It can apply to lack of diligence and to the willful rendering of imperfect performance. *See* Restatement (Second) of Contracts § 205, cmt. d. And, as is particularly relevant here, it applies when a party "is consciously aware of, and proceeds with deliberate disregard for, the potential harm to the other party." *Jaynes v. Strong-Thorne Mortuary*, 1998-NMSC-004, ¶ 13, 124 N.M. 613.

The covenant can be breached by the failure to disclose information when there is a duty to do so. In *Allsup's Convenience stores, Inc. v. N. River Ins. Co.*, 1999-NMSC-006, 127 N.M. 1, the New Mexico Supreme Court affirmed a jury verdict that the covenant had been breached under a similar set of facts. In that case, an insurer knew that a third party was doing an inadequate job handling claims for its insured. *See id.* ¶ 35. On appeal, the insurer argued that it was under no duty to disclose. *See id.* The Court disagreed, reasoning that "if good faith and fair dealing require

it, there can be an affirmative duty to act in order to prevent the denial of the other party's rights under the agreement." *Id.* Given that the disclosure would have prevented the insured from paying increased premiums, the Court concluded that the insurer had a duty to disclose. *See id.* ¶ 36.

The same reasoning applies here. Like the insurer in *Allsup's*, Segal withheld information that would have allowed the City to obtain the main benefit of its contract: information to aid it in determining whether to self-insure. Segal knew that the $4.6M number was wrong and should not be used for determining whether to switch to a self-insured plan or for deciding how to set rates. (UMFs 17 & 18) It knew that the $4.6M ESI number was low because it was the one who had pulled certain costs out of that number as part of the PBM selection process. (UMF 8) Segal was capable of providing reliable information but chose not to do so. (UMF 20) Segal was also capable of providing disclaimers and warnings but chose not to do so. (UMF 9, 14) To the contrary: when directly asked about the $4.6M number, it reassured the City that the number could be trusted. (UMF 16) As a result of this bad advice, the City, like the insured in *Allsup's*, ended up paying higher premiums for its health benefits in later years and ended up with less money in reserve in the initial year than it would have had if it had been able to set premium increases based upon correct data. (UMFs 21-25) Segal's conduct demonstrates that it was "consciously aware of, and proceed[ed] with deliberate disregard for, the potential harm to the" City, *Jaynes*, 1998-NMSC-004, ¶ 13, in breach of the covenant of good faith and fair dealing.

## B.     Segal Is Liable for Negligent Misrepresentation

New Mexico adheres to the Restatement (Second) of Torts § 552 definition of negligent misrepresentation. *See Stotlar v. Hester*, 1978-NMCA-067, ¶ 13, 92 N.M. 26. Section 552 relates to information negligently supplied for the guidance of others. *See id.* ¶ 12. New Mexico law has

distilled Section 552 into five elements. To establish negligent misrepresentation, a claimant must show (1) an untrue statement, (2) made by one who has no reasonable ground to believe the statement is true, (3) on which the speaker intends the listener to rely, (4) on which the listener did rely, and (5) that the reliance caused harm to the listener. *See Sawyer v. USAA Ins. Co.*, 912 F. Supp. 2d 1118, 1146-47 (D.N.M. 2012) (citing UJI 13-1632 NMRA). Misrepresentation can be by either commission or omission. *See Encinias v. Whitener Law Firm*, 2013-NMSC-045, *Id.* ¶ 20, 310 P.3d 611. The undisputed facts show that Segal made several negligent misrepresentations and omissions related to the Summary that it provided to the City.

1. ***Segal Misrepresented that the $4.6M Number Was a Reliable Estimate of FY20 Prescription Benefit Costs When It Knew the Number Was an Inaccurate Placeholder, and It Misrepresented that the Summary Could Be Relied on for the Purpose of Deciding Whether to Self-Insure***

The Summary projected that prescription costs for FY20 would be $4.6M. (UMF 11) It is undisputed that this was not true. (UMF 17) That is because Segal did not do the work to create a reliable estimate of prescription costs until after the summary was given to the City and after the City had switched to a self-insured model. (UMFs 12, 20)

As it turned out, Segal never had any reasonable ground to believe that $4.6M was an accurate number. The projection had been prepared as part of the evaluation of which PBM to choose if the City switched to self-insurance. For that evaluation, Segal omitted certain categories of costs. (UMF 8) This allowed everyone to make an "apples to apples" comparison between the competing PBMs, but it necessarily understated the actual costs. Nevertheless, Segal used this number as its cost projection when it prepared the Summary. In doing so, it did not add back in the removed costs, nor did it adjust the number to account for the fact that the $4.6M number was based on incomplete data. (UMF 12)

Relatedly, Segal misrepresented the nature of the Summary itself. Through statements and omissions, Segal led the City to believe that the Summary could be used to decide whether to switch to a self-insured model. For example, when Mr. Bhakta questioned Segal about how the $4.6M number could be so low, Segal explained that it was a correct indication of the savings the City would realize from rebates. (UMF 16) But this was also not true—as discussed above, Segal knew that it had included inaccurate data in the Summary. Segal also omitted critical warnings that would have alerted the City that the Summary could not be relied on—warnings that it included on other presentations. (UMFs 9, 14)  Instead, Segal confirmed the reliability of the Summary by indicating no further review was needed if the City proceeded with a fully-insured premium increase. But the data in the Summary was not reliable at *any* premium level increase because critical data had been omitted. (Ex. I, Bhakta Tr. at 211:3-212:18).

These misrepresentations were compounded by a critical omission. In the Summary, where the flawed projection was used, Segal failed to include any disclaimers that would indicate that the number was incomplete, inaccurate, or otherwise limited in any way. (UMF 14) Nor did it identify that the projection was taken from an earlier presentation that had omitted significant costs in order to facilitate an "apples-to-apples" comparison. (*Id.*) These omissions were contrary to both Segal's regular practice and the standard of care. (UMFs 7, 13). The failure to warn, combined with Mr. Petersen and Ms. Patani's assurances that the faulty number could be relied on, assured Mr. Bhakta that he could rely on Segal's inaccurate $4.6M projection.

Segal's use of a number that it knew was inaccurate, along with its assurances that the Summary could be relied on, were material misrepresentations, and Segal had no grounds to believe otherwise. Accordingly, the first two elements of negligent misrepresentation are satisfied.

2.      *Segal Intended for the City to Rely on Its Misrepresentations, and the City Did Rely on Them*

To satisfy the third and fourth elements of negligent misrepresentation, the City must show that Segal intended the City to rely on the misrepresentations and that the City did rely on them. Those elements are easily met here.

Segal intended that the City rely on both the Summary and the incorrect projection that it contained. The purpose of Segal's contract with the City was for Segal to provide reliable advice to the City about its health benefits questions. (UMF 6) Segal created and presented the Summary to the City specifically to assist the City in deciding whether to self-insure. (UMF 6, 10).

It is equally clear that the City did in fact rely on the incorrect projection in the Summary. As the City's CFO explained, the decision for the City to switch to a self-insured model was "based on the roughly $6 million that we would save just in prescription costs … ." (Bhakta at 31:7-9; UMF 19) That savings was the main factor in the decision to self-insure. (UMF 19) But for the incorrect projection, the City might have chosen to remain fully insured. (UMF 23)

Now, however, Segal contends that the Summary should not have been used to set rates or even to choose whether to self-insure. Instead, it claims, a "budget projection" was required, and the Summary could only be used to select a PBM.[8] But Segal never informed the City that the Summary could only be used for those limited purposes, (UMF 14) even after they learned that the City was using it for purposes beyond that limited scope. (UMF 15) To the contrary—Segal reassured the City that the numbers could be used. (*Id.*; *see also* UMF 16). Segal's argument is

---

[8] At the same time, Segal claims that it had conditioned the Summary on its recommendation that the City increase rates by at least 8%—a recommendation it made without the benefit of a "budget projection" or indeed of any additional analysis. Segal cannot have it both ways: either the Summary could be used to set rates or it could not. As Mr. Bhakta eventually realized, the inaccurate projection could not safely be used at any rate level, because it is not safe to set rates based on incorrect data. (Bhakta Tr. at 211:17-212:1)

also belied by the Summary itself. The Summary contains two columns: one showing the projected expenses of a self-insured model, the other showing the projected expenses of a fully-insured model. (UMF 11; *see also* Ex. B). It projects total annual projected expenses of $71.0M for the former and $79.8M for the latter. *Id.* The only purpose of such a comparison is to select whether to switch funding models—not which vendor to select.

Because Segal intended the City to rely on the Summary and the inaccurate projections it contained and because the City did rely on them, the third and fourth elements of negligent misrepresentation are satisfied. The only remaining question to establish liability is whether the City was harmed.

### C.      Segal's Actions Caused the City to Be Harmed

In this motion, the City seeks partial summary judgment as to liability only, leaving the amount of damages as a fact question for trial. So, while it must prove that it has been harmed in order to show that there is liability, it does not at this point need to prove a specific amount of damages. *See MacGregor v. MiMedx Grp.*, No. 1:19-cv-01189-PJK-GJF, at *10-11 & nn. 2-3 (D.N.M. May 18, 2021).

The undisputed facts show that the City was harmed. The City made its decision to switch to a self-insured model based primarily on the incorrect numbers from the summary—numbers which led the City to expect a large savings for prescription benefits. (UMF 19) The City set its premium increase rate at 3.5% based on the inaccurate projections. Had those numbers been correct, the City would have saved approximately $6M in prescription benefits costs. (UMF 24) This savings would have generated a larger reserve, which in turn would have allowed the City to lower premium rates in the future as compared to the increase in rates it put into effect in the years

after FY20. (*Id.*) The failure to receive a benefit reasonably expected under a contract is an independent harm, regardless of whether there are any other direct monetary damages. *See Famiglietta v. Ivie-Miller Enterprises, Inc.*, 1998-NMCA-155, ¶ 19, 126 N.M. 69.

On the other hand, had the projection in the Summary been correct, the City would have had to raise its premiums by at least 7% based on a higher, accurate prescription costs projection. (UMF 25). This would have resulted in higher reserves at the end of FY20. But it also would likely have meant that the City would have chosen to remain fully-insured.

Because the anticipated savings, which were never grounded in fact, did not come to pass, and because the City had set premiums lower than it would have with correct data, the City was forced to raise its premiums in the future to make up the shortfall. (UMF 23) Because the City pays for 80% of those increased premiums, (UMF 22) it has been harmed.

## V.    CONCLUSION

On the undisputed facts, the City is entitled to judgment as a matter of law that Segal is liable for counts one and two of the Complaint. By providing the inaccurate projection, Segal breached both the express terms of its contract and the implied warranty to use reasonable skill. Moreover, by doing so (and by failing to warn the City or correct its mistake later) Segal also became liable for negligent misrepresentation. Accordingly, the City asks this Court to grant partial summary judgment in its favor that Segal is liable under counts one and two of the Complaint, and for such other relief as the Court may deem just and proper.

Respectfully submitted,

**LAW OFFICES OF GEOFFREY R. ROMERO**

By: */s/ Geoffrey R. Romero*
        Geoffrey R. Romero
        4801 All Saints Rd. NE
        Albuquerque, NM 87120
        (505) 247-3338
        geoff@geoffromerolaw.com

           -and-

        Maureen A. Sanders
        SANDERS & WESTBROOK, P.C.
        102 Granite Avenue NW
        Albuquerque, NM 87102
        505-243-2243
        mas@sanwestlaw.com

        ***Attorneys for Plaintiff***

## CERTIFICATE OF SERVICE

    I hereby certify that on this 8th day of February, 2023, I filed the foregoing Motion for Summary Judgment electronically through the CM/ECF system, which caused all parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing.

By: */s/ Geoffrey R. Romero*
        Geoffrey R. Romero