**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

CITY OF ALBUQUERQUE,

        Plaintiff,

v.                                     No. 1:21-cv-00349-JHR-GJF

THE SEGAL COMPANY (Western States), a
Maryland Corporation d/b/a Segal Consulting.

        Defendant.

**RESPONSE IN OPPOSITION TO SEGAL'S MOTION FOR PARTIAL SUMMARY
JUDGMENT [DOC. 86]**

       Defendant The Segal Company ("Segal") raises two arguments in support of its request that counts one and two of the City of Albuquerque's (the "City")'s complaint should be dismissed. First, it contends that the City knew that the information it had provided was incomplete, and that it had only provided the incomplete information on the condition that the City set rates at 8% or higher. These arguments appear unrelated to any claim or defense in this case. Segal offers no legal authority in support of the argument that those alleged facts support dismissal of the claims. Second, Segal contends that the City was not damaged because the rate it selected—a rate of only 3.5% premium increase for FY20, less than half of Segal's recommendation—was actually too high, resulting in extra savings. Underpinning Segal's motion is its erroneous argument that the City can prove no damages. The City disagrees with Segal's claim that there were no damages. More importantly, the question of damages depends on disputed issues of fact that cannot be decided on summary judgment.

## I.      RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS[1]

Segal's motion includes 78 facts it claims are both undisputed and material, together with nearly three dozen exhibits. Segal itself does not reference or rely on nearly half of its UMFs.[2] For the purposes of this motion, the City does not dispute UMFs 1-5, 7, 9, 10-12, 14-15, 17, 19-20, 22-24, 26, 29-47, 49-66, 68, 70-72, and 75-78. The following UMFs are disputed:

UMF 6. The Financial Analysis section of the PBM RFP Analysis did not state that the cost projections not included were those for which rebates would not be received. It merely stated that "Cost and Utilization exclude specialty, compound, OTC, and paper claims."(MSJ Ex. 5 at 7)

UMF 8. Although the City's Purchasing Department had access to the Financial Analysis section of the PBM RFP Analysis as an advisor to the ad hoc committee evaluating the RFP responses, its role was limited to insuring compliance with the procurement requirements. (Ex. N, Saiz Tr. at 53:10-12) Segal was the subject matter expert hired to understand and evaluate the medical and prescription pricing because the City lacked that expertise and Segal assigned a score to the respondents and provided that score to the committee. (*Id.* at 51:24-52:18, 54:21-24)

UMFs 13 and 48.  Mr. Saiz and Mr. Bhakta continued to use the $4.6M projection to model contribution increases even after they learned that the projection did not include the cost of all of the prescription drugs because they understood that the $4.6M cost was the lion's share of the drug claims "because the compound, the specialty, the over-the-counter, as I understand, [were a] very small percentage of the overall cost." (Ex. N, Saiz Tr. at 140:11-16) The ESI proposal as Mr. Saiz

---

[1] Segal includes unsupported "facts" in its Motion without any citations to the record. When deciding this motion, the Court should limit its reliance to only those facts supported by the record. *See* Fed. R. Civ. P. 56(c)(1)(a).

[2] Segal's argument relies on or at least refers to 43 of its UMFs: Nos. 6, 11-16, 24-30, 36, 40-52, 55-56, 59-62, 66, 69, 70-71, and 74-78. It makes no reference to 35 UMFs: Nos. 1-5, 7-10, 17-23, 31-35, 37-39, 53-54, 57-58, 63-65, 67-68, and 72-73; these UMFs are by definition not material to its motion.

understood it was a $9.6 million gross cost with a $4.3 million rebate to get to the $4.6 million amount. (*Id.* at 140:23-141:1)

UMF 16.  Segal estimated that the City would need to reserve approximately $5.3M for IBNR, and that the claims fluctuation reserve target was between one and two months of paid claims. However, Segal had also advised the City that it could take several years to hit the desired reserve.  (Ex N, Saiz Tr. at 105:5-7)

UMF 18.  The City forecasted a 15% contribution rate increase for FY20 in November 2018 as part of its budget process and five-year forecast. That forecast was not used when setting premiums.  (Ex. N, Saiz Tr. at 59:4-7; 163:23-164:7)

UMF 21.  While Exhibit 12 included a recommendation from Segal to use the "higher fully insured rates for funding," Exhibit 11 contains no such recommendation. What Segal meant by "higher fully insured rates for funding" is unclear given that the rates proposed by Presbyterian for a fully-insured rate included profit which was not an appropriate factor for a self-insured program. (Saiz Tr. at 94:25-95:16) In fact, Mr. Saiz understood that a fully insured rate increase of 8.7% would translate to a rate of 7% increase if the City went to self-insured and did not have to provide for profit. (*Id.*)

UMFs 25 and 28.  Segal's use of the incorrect projection was not "conditioned" on anything. While the communications described in these UMFs took place, Segal included no conditions in its presentation, and in fact repeatedly assured the City's CFO that they could be relied on at the February 15, 2019 meeting. (AMF G)

UMF 27.  The February 8 email described that the Summary would use "the data ESI presented in the RFP as a proxy." (MSJ Ex. 12) But the data ESI presented in its RFP bid included

more drug claim projections than that reflected in the Summary as $4,600,600 net of rebates. Segal subtracted items out of ESI's proposal to arrive at the incorrect $4.6M projection that it used as a placeholder. (AMFs B-D, H)

UMF 30. The meeting described took place, but Segal has listed the attendees incorrectly. Nura Patani, the actuary replacing Gary Peterson as the primary consultant, also attended the meeting.  (Bhakta Tr. at 114:22-25; AMF G)

UMF 67. This UMF misstates Mr. Bhakta's testimony. Mr. Bhakta's testimony was that if he had been "provided different data[] reflecting higher prescription costs," he would have been "required" to increase premiums. (Bhakta Tr. at 209:17-210:1) When Segal's attorney asked for speculation, Mr. Bhakta declined to speculate. (*Id.* at 210:14-18)

UMF 69.  It is not true the City would have "targeted an 11% contribution increase" had it been given accurate projections. Mr. Saiz prepared the chart to determine an after the fact "guesstimate" of what rate increase would have been needed if the City had been provided the correct data and wanted to target a similar reserve to $5.9M for FY20. (Saiz Tr. at 218:11-221:3) But the CFO's rationale for limiting the rate increase to 3.5% would have remained unchanged— that rate appeared to provide adequate reserves while allowing the remaining money to be spent on other areas. (Bhakta Tr. at 98:23-101:1)

UMF 73.  Segal's incomplete quote is misleading. The full quote is "Bottom line—our reserve does look good, but we need to be conservative/cautious until we (and the world) are operating at 100%. Meaning, the pent-up demand is real and will hit us over the next year." (MSJ Ex. 29)

UMF 74. This UMF states that McGriff determined that the City was "overreserved" at the time McGriff took over from Segal. However, the McGriff Transcript and Exhibit 26 provided by Segal show that at the end of calendar year 2020 the City was above a targeted reserve. (MSJ Ex. 26)

## II.    STATEMENT OF ADDITIONAL UNDISPUTED MATERIAL FACTS

The following additional undisputed material facts are also necessary to respond to Segal's motion for summary judgment. Although Segal makes no attempt to negate liability, the undisputed facts show that Segal knowingly and recklessly provided inaccurate data to the City:

A.  Segal advised the City on the decision of whether to switch its health benefits plan from a fully-insured to a self-insured plan. (Compl. ¶ 8; Ex. C, Ward Tr. at 37:16-20; Ex. D, Sherman Tr. at 17) In performing these consulting services, Segal had a duty to base its recommendations on correct data and to take into consideration any limitations in that data. Segal also had a duty to communicate its recommendations appropriately given the circumstances and the intended users. Finally, it had a duty to use appropriate internal review procedures to ensure the accuracy of its recommendations. (Ex. E, DeWeese Report at 8-9).

B.  On Feb. 11, 2019, Segal provided the City with a "Summary of Cost Analysis for Effective Dates of July 1, 2019 – June 30, 2020." (Ex. A) The purpose of the Summary was to compare the value of going self-funded to remaining fully insured for FY20. (Ex. C, Ward Tr. at 59:19-25, 73:7-12)

C.  The Summary projected that the FY20 prescription claims costs would be $4,600,600 net of rebates under the self-funded plan and $10,891,238 under the fully insured arrangement,

5

a difference of over \$6.2M. (Ex. A at 2) It projected a total savings of about \$8.8M under

the self-funded plan. (*Id.*)

| Projected Expenses | Presbyterian Health Plan/ESI | Presbyterian Health Plan |
|---|---|---|
| Retention | \$  4,048,559 | \$  8,678,956 |
| Wellness | \$  94,002 | Included |
| PBM & Stop Loss Integration Expense | \$  55,104 | \$ |
| Gym Membership | \$  1,102,090 | Included |
| Mobile Clinic Capitation | \$  891,396 | Included |
| Pooling/Stop Loss Fees (1) | \$  2,626,377 | \$  2,626,377 |
| Total Non-Claims Cost | \$  8,817,527 | \$  11,305,332 |
| Unidentified Costs | \$  - | \$  353 |
| Claims Cost | | |
| Medical Claims | \$  57,607,683 | \$  57,607,683 |
| Rx Claims (2) | \$  4,600,600 | \$  10,891,238 |

Ex. A at 2 (emphasis added).

D. Segal had not performed an independent projection to calculate the \$4,600,600 number

included in the Summary, but instead had simply recycled the number it had computed

related to ESI in its comparison of the PBM bids. (Ex. A at 1) But it had previously removed

certain claims costs, such as specialty drugs, from that number. (Ex. B. at 7) In recycling

the number, it did not add back the previously removed costs, nor did it adjust the number

to account for the fact that the \$4.6M number was based on old data. (Ex. D, Sherman Tr.

at 88-89; Ex. E, DeWeese Report at 4.)

E. Although Segal had an internal review process that required at least three people to look at

work product before it was given to a client, (Ex. D, Sherman Tr. at 65:2-9; Ex. F, Henry

Tr. at 33:16-35:9) that process was not followed with respect to the Summary. (Ex. G,

Petersen Tr. at 77:5-11; Ex. H, Patani Tr. at 25:20-23).

F. The Summary did not contain any disclaimers, warnings, or limitations as to what the

projected expenses in it could be used for. (*See* Ex. B) Claims costs for self-insured and

fully-insured were the same so Mark Saiz asked Gary Peterson what explained the difference on the Summary. Peterson explained it was because Presbyterian was keeping $6M in rebates. (Ex. N, Saiz Tr. at 74:12 -76:1)

G. On February 15, 2019, Segal employees Peterson and Patani met with Mr. Bhakta and Mr. Saiz to explain the Summary. Mr. Bhakta asked Segal about the large difference between prescription costs for insured versus self-insured and asked how the self-insured costs could be so low. (Ex. I, Bhakta Tr. at 116:15-21, 200:16-201:4) Segal responded that the difference was explained by the fact that under the self-insured plan, the City would be getting the rebates. (*Id.* at 117:1-6; 200:23-201:4)

H. As Segal now admits, the $4.6M projection was incorrect:

> **ANSWER**: Segal admits that in February 2020 it advised that City that a document that was attached to a February 11, 2019 email that Segal sent to the City included one incorrect data field that related to the projected prescription drug claims for the future period July 1, 2019 through June 30, 2020. Segal denies the remaining allegations in Paragraph 31.

(Answer ¶ 31; *see also id.* ¶ 34; Ex. D, Sherman Tr. at 45:3-14; 89:5-7; Ex. C, Ward Tr. at 25:17-22, 74:18-75:4; Ex. J, 2/10/20 Patani Email (describing the $4.6M number as understated)) Segal's employees called the Summary "sloppy." (Ex. F, Henry Tr. at 134) In a January 27, 2020 email, Ms. Patani, the lead consultant to the City, expressed "frustration" about the projections she and Mr. Petersen had presented to the City, instructing her team to "be careful about how we talk about things our predecessors did that we might have done differently ... ." (Ex. K, 1/27/20 Patani Email). Segal also maintains that it had no duty to warn the City of its inaccurate data, or to review the data

for accuracy because the City did not specifically contract and pay Segal to warn the City of Segal's own ineptitude. (Ex. F, Henry Tr. at 138:5-21) And when Mark Saiz later questioned the accuracy of the Segal projection in August 2019, Segal did not advise the City of its inaccurate projection. (Ex. P, M. Saiz 2/5/20 Email)

I.  The most important factor in the City's decision to change to self-insured was the savings attributable to prescription claims, which was based on the incorrect $4.6M estimate in the Summary. (Ex. I, Bhakta Tr. at 31:2-18, 198:5-9, 201; Ex. L, Rivera Tr. at 92)

J.  Subsequently, in September 2019, Segal provided a revised set of projections to the City for FY20.[3] The revised projections estimated the prescription costs for FY20 at $12,814,269 with rebates of $2,179,400, for a total of $10,634,869 net of rebates. (Ex. M, FY20-22 Projection) This estimate was $6,034,269 more than the $4.6M projected prescription costs for FY20 in February 2019.

Segal's only argument in its motion for summary judgment is that its inaccurate projections did not damage the City. However, it is only able to make this argument by focusing on FY20— an unusual year for medical expenses due to the pandemic—and by ignoring that the City's decision to switch was premised on the false annual savings Segal had promised the City and that that annual savings never came to pass. Additional facts illustrate the City's damages:

K.  The City used Segal's incorrect $4.6M projection to develop the cost premium projections to arrive at a 3.5% premium increase for FY20. (Ex. L, Rivera Tr. at 91:17-18.) The City verified that budget with Segal. (Ex. I, Bhakta Tr. at 223:20-24).

---

[3] The City's fiscal years are as follows: FY20: July 1, 2019-June 30, 2020; FY21: July 1, 2020-June 30, 2021; FY22: July 1, 2021-June 30, 2022; and FY23: July 1, 2022-June 30, 2023.

L.  The City pays 80% of the premiums for its employees. (Ex. I, Bhakta Tr. at 39:18-22) When the premiums are increased, both the employees and the City bear that cost. (*Id.* at 207:19-21)

M.  But for the incorrect estimate, the City might never have chosen to self-insure. (Ex. I, Bhakta Tr. at 31:3-6) As a result of the incorrect estimate, the City set the premium increase for the initial fiscal year at a lower rate than it would have if it had the correct data, resulting in collection of less premium.

N.  If the City had been provided the correct data it would likely have raised the premium by at least 7% which would have resulted in additional monies in the reserve at the end of FY20. (*Id.* at 210:19-22)

O.  Because the City had set premiums according to inaccurate data, and had less in reserve as a consequence, it had to raise premiums more than it would have been required to in the subsequent years. (Ex. E, DeWeese Report at 9-10; Ex. I, Bhakta Tr. at 206-08, *see also* Ex. O, 3/13/19 email from T. Rivera to S. Bhakta)

P.  Had the $4.6M number been correct, the City would have been able to use the approximately $6M **per year** in extra funds to build its reserve and would have had the ability to avoid increasing the premiums. (Ex. I, Bhakta Tr. at 206-208, 36:12-37:4; 52:21-23). It could also have used that money to fund other programs. (*Id.* at 98:23-101:1)

Q.  The City's FY20 reserve was "saved" by "sheer luck" due to the pandemic because it resulted in reduced demand for medical claims. (*Id.* at 42:20-23; Saiz Tr. at 186:25-187:3;208:21-209:4)

R. The City relied on Segal to do an analysis of the pharmacies' responses to the RFP for prescription drugs because the City (i.e. Mark Saiz) did not have the subject matter expertise to do that analysis. "You needed a team of pharmacists to review and vet these. That's why we contracted Segal." (Ex N, Saiz Tr. at 172:20-173:2)

## III.   SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). When a defendant moves for summary judgment, it "bears the initial burden to 'show that there is an absence of evidence to support the nonmoving party's case.'" *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Once the movant meets this burden, Rule 56 requires the nonmoving party to designate specific facts showing that there is a genuine issue for trial. *See Celotex*, 477 U.S. at 324. However,

> merely establishing the absence of genuinely disputed facts will not carry the day for the summary judgment movant. The movant must also demonstrate that the applicable controlling law requires a decision in the movant's favor. The question... is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. On summary judgment the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion.

*Presbyterian Healthcare Servs. v. Factory Mut. Ins. Co.*, 512 F. Supp. 3d 1169, 1174 (D.N.M. 2021) (internal quotation marks ant citations omitted). The ultimate inquiry in a summary judgment disposition is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

IV.     **SEGAL HAS NOT MET ITS BURDEN TO SHOW THAT IT IS ENTITLED TO DISMISSAL OF COUNTS ONE AND TWO**

Segal's motion seeks to dismiss counts one and two of the City's complaint, which are for breach of contract and negligent misrepresentation, respectively. But we only know this from a single sentence in the introductory paragraph; Segal's motion does not set forth or analyze any of the applicable law. *See* MSJ at 1. Segal makes an almost exclusively factual argument, untethered to any substantive law. Segal's cursory, unsupported arguments are insufficient to justify dismissal of the City's remaining claims. Segal provides almost no legal argument or authority in support of its positions, failing to even identify the causes of actions or their elements. As discussed next, it has not shown that it is entitled to dismissal of counts one and two.

A.     **Segal's Motion Should Be Denied Because Segal Has Failed to Support Its Arguments with Legal Authority**

The Court may grant summary judgment if Segal meets its burden to show that, on the undisputed facts, Segal "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Segal has not met that burden because its motion contains almost no discussion of the law of this case, let alone analysis as to why, applying the law to the undisputed facts, the issues are "so one-sided that [Segal] must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

Of Segal's ten pages of legal argument, only three sentences are supported by citation to legal authority. *See* MSJ at 18-27. The majority of the authority Segal cites appears in its recitation of the standards for summary judgment, with which this court is undoubtedly quite familiar. *See* MSJ at 17. This section accounts for eight of the fourteen authorities identified in its table of authorities. *See id.* at ii. Of the six cases Segal uses in its argument section, five support its argument that the City was not damaged. *See* MSJ at 25-26. The only other citation to authority in

Segal's motion appears in footnote six and contains a brief reference to the covenant of good faith and fair dealing, an argument that is otherwise undeveloped in Segal's motion.

Though Segal's burden was to show that it was entitled to judgment as a matter of law, it has largely ignored the substantive law underlying the City's complaint. As a result, it has not shown that it is entitled to summary judgment. To the contrary—with the exception of the damages issue, it has waived any arguments it may have had by failing to develop or support them. *See, e.g.*, *Tietjen v. Colvin*, 527 F. App'x 705, 709 (10th Cir. 2013) (finding that arguments raised in a perfunctory manner are waived); *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1161 (10th Cir. 2012) ("We will consider and discuss only those of her contentions that have been adequately briefed for our review."); *Wall v. Astrue*, 561 F.3d 1048, 1065 (10th Cir. 2009) (declining to consider undeveloped argumentation and deeming the issue waived); *Hill v. Kemp*, 478 F.3d 1236, 1251 (10th Cir. 2007) ("[O]ur rule against entertaining new arguments in reply in no way precludes us from supplementing the contentions of counsel through our own efforts. But neither does it compel us to undertake such self-directed research or pursue late and undeveloped arguments, and we exercise caution in doing so... ."); *United States v. Wooten*, 377 F.3d 1134, 1145 (10th Cir. 2004) ("The court will not consider such issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation." (quotation omitted)); *Hardeman v. City of Albuquerque*, 377 F.3d 1106, 1122 (10th Cir. 2004) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived).

**B.**   **Segal Has Not Shown that It Is Entitled to Judgment Dismissing Count Two for Negligent Misrepresentation**

New Mexico adheres to the Restatement (Second) of Torts § 552 definition of negligent misrepresentation. *See Stotlar v. Hester*, 1978-NMCA-067, ¶ 13, 92 N.M. 26. Section 552 relates

to information negligently supplied for the guidance of others. *See id.* ¶ 12. The New Mexico courts have distilled the Restatement's standard into five elements: (1) an untrue statement, (2) made by one who has no reasonable ground to believe the statement is true, (3) on which the speaker intends the listener to rely, (4) on which the listener did rely, and (5) the reliance caused harm to the listener. *See Sawyer v. USAA Ins. Co.*, 912 F. Supp. 2d 1118, 1146-47 (D.N.M. 2012) (citing UJI 13-1632 NMRA). Misrepresentation can be by either commission or omission. *See Encinias v. Whitener Law Firm*, 2013-NMSC-045, ¶ 20, 310 P.3d 611.

As best as the City can discern, the only one of these elements that Segal's motion attacks is the last one: the causing of harm to the listener. Segal's argument related to that element focuses solely on damages. However, because Segal does not tie any of its arguments to any of the elements of count one or two, this Court and the City can only guess at what legal argument Segal is trying to make. The City assumes that Segal's damages argument (Part II of its argument) is meant to apply to both counts one and two. That argument is addressed in Part IV.D below.

It is more difficult to guess what area of law Part I of Segal's argument relates to, since it contains no citations to authority and mentions no causes of action. Part I.A, which mentions in passing the concept of reasonable reliance, may relate to negligent misrepresentation. *See* MSJ at 18-19. Part II.B, which argues that the City should have set rates at 8% or higher,[4] appears to have no relation to the elements of the City's claims, or perhaps makes an argument about the purely factual issue of comparative fault. *See* MSJ at 19-22.

---

[4] Confusingly, Segal argues both that the City was not damaged by setting rates at 3.5%, but also that the City should have set rates at 8% or higher, apparently creating its own dispute on the fact question of damages.

Because Segal has not anchored its argument in the applicable substantive law, the City can only respond by going through all of the elements of negligent misrepresentation and showing that there is evidence to support each of them. Essentially, Segal's undeveloped arguments have shifted its work onto the City and this Court. But Segal still has the burden to establish that it is entitled to judgment as a matter of law based on undisputed facts.

1.   *Segal Misrepresented that the $4.6M Number Was a Reliable Estimate of FY20 Prescription Benefit Costs When It Knew the Number Was an Inaccurate Placeholder, and It Misrepresented that the Summary Could Be Relied on for the Purpose of Deciding Whether to Self-Insure*

The first two elements of negligent misrepresentation are that (1) Segal made an untrue statement, and (2) Segal had no reasonable ground to believe its statement was true. It is undisputed that both of these elements are met.

The Summary that Segal presented to Mr. Bhakta at the February 15, 2019 meeting projected that prescription costs for FY20 would be $4.6M. (AMF C) It is undisputed that this was not true. (AMF H) That is because Segal did not do the work to create a reliable estimate of prescription costs until after the summary was given to the City and after the City had switched to a self-insured model. (AMFs D, J)

As it turned out, Segal never had any reasonable ground to believe that $4.6M was an accurate number. The projection had been prepared as part of the evaluation of which PBM to choose if the City switched to self-insurance. For that evaluation, Segal omitted certain categories of costs. (AMF D) This allowed everyone to make an "apples to apples" comparison between the competing PBMs, but it necessarily understated the actual costs. Nevertheless, Segal used this number as its cost projection when it prepared the Summary. In doing so, it did not add back in

the removed costs, nor did it adjust the number to account for the fact that the $4.6M number was based on incomplete data. (*Id.*)

Segal also misrepresented the nature of the Summary itself. Through statements and omissions, Segal led the City to believe that the Summary could be used to decide whether to switch to a self-insured model. For example, when Mr. Bhakta questioned Segal about how the $4.6M number could be so low, Segal explained that it was a correct indication of the savings the City would realize from rebates. (AMF G) But this was also not true—as discussed above, Segal knew that it had included inaccurate data in the Summary. Segal also omitted critical warnings that would have alerted the City that the Summary could not be relied on. (AMF F)

Now, Segal tries to shift the responsibility and the blame to the City. *See* MSJ at 18-19. Segal contends that it had given the correct information to Mr. Saiz, and it was Mr. Saiz who bears the fault for not informing Mr. Bhakta that the information that Segal provided at the February 15 meeting was incomplete and could not be relied on. *See* UMFs 11-14. Mr Saiz believed that the prescriptions claims which were included was the lion's share of the claims costs." (Ex. N, Saiz Tr. at 140:11-16) Mr. Saiz was informed by Segal that Presbyterian had been keeping $6M in rebates while the City was fully-insured. (AMF F) At best, this presents a factual question of comparative fault for the jury. Segal remains liable for Mr. Petersen's and Ms. Patani's misrepresentations to the City so long as they were one of the causes of the City's damages. *See, e.g.*, *Gutierrez v. City of Albuquerque*, 1998-NMSC-027, ¶ 11, 125 N.M. 643 ("Under our comparative negligence system, each negligent party is charged an amount representing its percentage of fault."); *Garcia v. Gordon*, 2004-NMCA-114, ¶ 8, 136 N.M. 394 (noting that when two or more parties cause a single injury, comparative fault "holds all parties fully responsible for

their own respective acts to the degree that those acts have caused harm"); *id.* ¶ 9 ("The doctrine of pure comparative negligence ... simply recognizes that the fault of two or more parties may combine to cause an injury.").

Segal's use of a number that it knew was inaccurate at the February 15 presentation, along with its assurances that the inaccurate projection could be relied on, were material misrepresentations, and Segal knew it. Accordingly, the first two elements of negligent misrepresentation are satisfied.

> **2.      *Segal Intended for the City to Rely on Its Misrepresentations, and the City Did Rely on Them***

To satisfy the third and fourth elements of negligent misrepresentation, the City must show that Segal intended the City to rely on the misrepresentations and that the City did rely on them. Those elements are also supported by undisputed facts, and Segal does not contend otherwise.

Segal intended that the City rely on both the Summary and the incorrect projection that it contained. The purpose of Segal's contract with the City was for Segal to provide reliable advice to the City about its health benefits questions. (UMF 1) Segal created and presented the Summary to the City specifically to assist the City in deciding whether to self-insure. (AMF B).

It is equally clear that the City did in fact rely on the incorrect projection in the Summary. As the City's CFO explained, the decision for the City to switch to a self-insured model was "based on the roughly $6 million that we would save just in prescription costs … ." (Ex. I, Bhakta Tr. at 31:7-9; AMF I) That savings was the main factor in the decision to self-insure. (AMF I) But for the incorrect projection, the City might have chosen to remain fully insured. (AMF M)

Because Segal intended the City to rely on the Summary and the inaccurate projections it contained and because the City did rely on them, the third and fourth elements of negligent

misrepresentation are satisfied. The only remaining element—and the only one addressed by Segal's motion—is damages, which the City addresses in Part IV.D below.

### C.    Segal Has Not Shown that It Is Entitled to Judgment Dismissing the City's Contract Claims (Count One)

Count One raises contract law claims under three distinct theories: breach of contract, breach of the implied warranty to use reasonable skill, and breach of the covenant of good faith and fair dealing. As explained below, Segal has not developed any arguments specific to these claims. Instead, as with the misrepresentation count, Segal appears to have placed all of its eggs into the "no damages" basket.

#### 1.    *Segal's Motion Makes No Argument Specifically Directed to the Breach of Contract Claim*

Count 1 of the City's complaint alleges that Segal breached its contract with the City. Compl. ¶¶ 37-40. To prove its breach of contract claim, the City must show (1) the existence of a contract, (2) breach, and (3) damages. *See, e.g.*, *Am. Mech. Sols., LLC v. Northland Process Piping*, 184 F. Supp. 3d 1030, 1067 (D.N.M. 2016). As to the first element, Segal concedes that there was a contract between it and the City. *See* UMF 1 (explaining some of Segal's obligations under the contract). As to the second argument, Segal has not shown, nor has it even attempted to show, that there is an absence of evidence to support the City's breach of contract claim. The only argument that Segal raises regarding the breach of contract claim is that the City has not been damaged, *see* MSJ at 22-27, which the City responds to below.

#### 2.    *Segal's Motion Makes No Argument Specifically Directed to the City's Claim that Segal Breached the Implied Warranty to Use Reasonable Skill*

Segal admits the existence of a contract between it and the City. UMF 1. New Mexico implies in every contract a warranty that the contracted-for services will be rendered in conformity to the standard of care within the profession or trade. *See State ex rel. Risk Mgmt. Div. v. Gathman-*

*Matotan Architects*, 1982-NMCA-130, ¶¶ 9-11, 98 N.M. 790. The City alleged that Segal breached that implied warranty. *See* Compl. ¶ 39.

As with the breach of contract claim, Segal makes no arguments specifically directed at the City's claim that Segal failed to use reasonable skill in performing its obligations under the contract. Segal does not argue that it had no such duty. It develops no evidence as to the standard of care and, as a result, does not contend that the undisputed facts show that that standard was not breached. It cites no law regarding this part of count one. As with the other claims, Segal's argument as to the implied warranty claim can only succeed if it prevails on its argument that the City was not damaged. The City addresses that argument in Part IV.D below.

The requirements of proof for an implied warranty claim are similar to a cause of action in negligence. *See Gathman-Matotan*, 1982-NMSC-430, ¶ 11. Thus, the City must prove duty, breach, causation, and damages to prevail on this claim. *See, e.g.*, *Payne v. Hall*, 2004-NMCA-113, ¶ 17, 136 N.M. 380 (elements of negligence). In particular, it must show that Segal failed to exercise the knowledge, care, and skill of reasonably well-qualified professionals practicing under similar circumstances. *See Adobe Masters, Inc. v. Downey*, 1994-NMSC-101, ¶ 3, 118 N.M. 547.

The City's expert, Charles C. DeWeese, described the applicable standard of care. The American Academy of Actuaries publishes Actuarial Standards of Practice ("ASOPs") which provide guidance for actuaries. Among other things, the ASOPs require actuaries to base their conclusions on current data and to be mindful of any limitations to that data. (AMF A)  In addition, an actuary should ensure that the form and content of his communications are appropriate to the circumstances and take into account the intended users. (*Id.*) Finally, consulting firms should

subject client work product to an internal review process, and that process should be rigorously documented. (*Id.*)

The undisputed facts show that Segal breached these duties. First, Segal did not use the requisite level of skill and care when it included the $4.6M number from the PBM evaluation in the Summary. The $4.6M number was based on partial data. (AMF D) Segal did not update that data and did not add back in the amounts it had removed for the PBM selection process. (*Id.*) As a result, the number necessarily understated the projected prescription claim expenses for FY20. Despite this, Segal assured Mr. Bhakta that the $4.6M number was, in fact, a reliable projection. (AMF G) Segal was aware when it did so that the City was relying on the projection to decide whether to self-insure. (AMF K)

Second, Segal did not use the requisite level of skill and care in communicating this information to the City. Unlike the bid analysis, which a contained disclaimer, the Summary contained no warnings that it could not be relied on. (AMF F) The Summary was intended to help the City choose between a self-insured and a fully-insured model, and there was no indication that it was not fit for that purpose. (AMFs B, F) In addition, Segal further confirmed the reliability of the number when pressed about it by Mr. Bhakta at the February 15, 2019 meeting. (AMF G)

Third, Segal failed to exercise the required level of skill and care by failing to carry out and document any review process on the data they presented to the City. According to Segal, its practice was to use an internal review process where at least three people would look at any work product before it was sent to the client. (AMF E) That review process is also the applicable standard of care in this industry. (AMF A) But none of Segal's employees could say that that process was followed with respect to the Summary. (AMF E) Because of this breakdown in the review process,

Segal presented the City with an incorrect number that had not been properly vetted to use for making the decision of whether to switch to a self-insured model. (AMFs C, H)

As a sophisticated consultant, Segal had a duty to ensure that the information it gave the City could be relied on or, failing that, to clearly communicate to the City any limitations. Instead, it cut-and-pasted an incorrect number and passed it off as a correct projection of prescription claims expenses. By doing so, it breached the implied warranty to use reasonable skill.

### 3.   Segal's Undeveloped Argument that It Did Not Breach the Duty of Good Faith and Fair Dealing Fails Because the Undisputed Facts Show Segal's Recklessness and Bad Faith

Count 1 also alleges that Segal breached the covenant of good faith and fair dealing. Compl. ¶ 39. Segal's sole reference to this part of the City's complaint appears in footnote six, which, citing no evidence, contains a conclusory assertion that the City cannot show that Segal acted in bad faith, wrongfully, or intentionally. *See* MSJ at 22 n.6. The footnote fails to establish that Segal is entitled to judgment as a matter of law.

Every contract in New Mexico imposes on the parties a duty of good faith and fair dealing in the performance of the contract. *Continental Potash, Inc. v. Freeport-McMoran, Inc.*, 1993-NMSC-039, ¶ 64, 115 N.M. 690. The covenant "requires that neither party do anything that will injure the rights of the other to receive the benefit of their agreement." *Bourgeous v. Horizon Healthcare Corp.*, 1994-NMSC-038, ¶ 16, 117 N.M. 434; *see also* UJI 13-832 NMRA ("The implied promise is breached only when a party seeks to prevent the contract's performance or to withhold the contract's benefits from the other party."). It can apply to lack of diligence and to the willful rendering of imperfect performance. *See* Restatement (Second) of Contracts § 205, cmt. d. Importantly, the covenant applies when a party "is consciously aware of, and proceeds with

deliberate disregard for, the potential harm to the other party." *Jaynes v. Strong-Thorne Mortuary*, 1998-NMSC-004, ¶ 13, 124 N.M. 613.

As is relevant here, the covenant can be breached by the failure to disclose information when there is a duty to do so. In *Allsup's Convenience stores, Inc. v. N. River Ins. Co.*, 1999-NMSC-006, 127 N.M. 1, the New Mexico Supreme Court affirmed a jury verdict that the covenant had been breached under a similar set of facts.  In that case, an insurer knew that a third party was doing an inadequate job handling claims for its insured. *See id.* ¶ 35. On appeal, the insurer argued that it was under no duty to disclose that information. *See id.* The Court disagreed, reasoning that "if good faith and fair dealing require it, there can be an affirmative duty to act on order to prevent the denial of the other party's rights under the agreement." *Id.* Given that the disclosure would have prevented the insured from paying increased premiums, the Court concluded that the insurer had a duty to disclose it. *See id.* ¶ 36.

The same reasoning applies here. Like the insurer in *Allsup's*, Segal withheld information that would have allowed the City to obtain the main benefit of its contract: information to aid it in determining whether to self-insure. Defendant knew that that the $4.6M number was wrong and could not be used for determining whether to switch or how to set rates. (AMF H) Segal was capable of providing reliable information but chose not to do so. (AMF J) Segal knew the correct amount of rebates. (AMF D) Segal was also capable of providing disclaimers and warnings but chose not to do so. (AMF F) To the contrary: when the City's CFO directly asked about the $4.6M number, Segal reassured him that it could be trusted. (AMF G) As a result of this bad advice, the City, like the insured in *Allsup's*, ended up paying higher premiums for its health benefits in later years. (AMFs K-P) Moreover, Segal did not correct the City even after it knew the City was relying

on the $4.6M projection. (AMFs H, K) And then later when questioned about the accuracy of its projections, Segal tried to conceal the fact that it had provided an inaccurate number to the City. (AMF H; *see also* Ex. K)

By reassuring the City that it could use a projection that it knew was wrong, and by failing to correct that misinformation when it knew the City was relying on it, Segal's conduct showed that it was "consciously aware of, and proceed[ed] with deliberate disregard for, the potential harm to the" City. *Jaynes*, 1998-NMSC-004, ¶ 13. As with the other contract claims in count one, Segal can only obtain summary judgment on the City's good faith and fair dealing claim if it prevails on its argument that the City cannot show that it was damaged.

**D.      The Existence and Amount of Damages Are Disputed Issues of Material Fact**

The core of Segal's motion for summary judgment—indeed, the only one that it supports with any legal authority—is its claim that the City was not damaged by Segal's breaches of its various duties. To do so, it sets up a straw man damages theory—that the health plan, by itself, did not lose money in FY20—which it then attempts to knock down by arguing that (1) it is contrary to the evidence or (2) it relies on speculation. *See* MSJ at 22-27. But Segal misstates the City's damages theory, and it ignores the existence of concrete, non-speculative evidence that shows that Segal's conduct harmed the City.

The City's damages argument is straightforward: the flawed prescription projections that Segal presented caused the City to set a premium increase too low, lower than it would have if correct data was provided. This resulted in a lower reserve at the end of FY20. As Segal notes, that reserve was still sufficient for FY20. *See* UMF 66. Segal attributes this to the decision to self-insure. *See* UMFs 61, 62. What Segal neglects to explain is that that result was largely due to the

unexpected effect of COVID, which reduced demand for medical care. (AMF Q). Segal also disregards that the reserve would be higher if the City had set premiums in accordance with accurate data. (AMF N) And Segal would like the Court to look no further than the first year of implementation, FY20, and disregard that the City had to raise premiums in subsequent years because of the premiums set in reliance upon Segal's inaccurate data. (AMF O)

Segal's argument fails once the subsequent fiscal years are taken into account. As time passed, patients once again began to seek medical care, resulting in increased medical expenses. This caused the City to have to increase premiums more than it would have had it set the initial premiums higher than 3.5%.

All of this was a result of Segal's presentation of the bad projections to the City's CFO at the February 15 meeting, and its subsequent decision not to correct its mistake. The City made its decision to switch to a self-insured model based primarily on the incorrect numbers from the Summary—numbers which led the City to expect a large savings for prescription benefits. (AMF I). Had those numbers been correct, the City would have saved approximately $6M in prescription benefits costs. (AMF P) This savings would have generated a larger reserve, which in turn would have allowed the City to use lower rates in subsequent years, or to use those funds elsewhere. (*Id.; see also* AMF P) Instead, because the anticipated savings, which were never grounded in fact, did not come to pass, the City was forced to *raise* its premiums in subsequent years to make up the shortfall. (AMF O) Because the City pays for 80% of those increased premiums, (AMF L) it bore 80% of that cost. In other words, it has been harmed.

Segal also contends that the City has not been harmed because it has saved money by transitioning to a self-insured plan. But this is not true: the City has suffered a significant loss of

expected benefits of the transition to self-insured. Under the projections presented by Segal, Petersen and Patani, Mr. Bhakta had an expectation the City would save approximately six million dollars each year going forward following the transition. (AMF P, Ex. I, Bhakta Tr. at 201:17-22). This expected savings was the primary reason for the City's decision to transition to a self-insured program. (AMFs I,M) For each year from the time of transition to present the City expected to receive the benefit of savings of approximately $6M per year. This is true for FY20, FY21, and FY22. The failure to receive a benefit reasonably expected under a contract is an independent harm, regardless of whether there are any other direct monetary damages. *See Famiglietta v. Ivie-Miller Enterprises, Inc.*, 1998-NMCA-155, ¶ 19, 126 N.M. 69. While the City has been able to save money as a result of the transition, it was in large part due to the unexpected effects of a pandemic, and it was nowhere near the levels in Segal's presentations and projections that prompted the City to transition from fully-insured to self-insured.

## V.   CONCLUSION

Segal has not and cannot show that it is entitled to summary judgment dismissing all remaining counts against it. The City has offered evidence to show that by providing the inaccurate projection, Segal breached both the express terms of its contract and the implied warranty to use reasonable skill. Moreover, by doing so (and by failing to warn the City or correct its mistake later) Segal also became liable for negligent misrepresentation. Finally, the City has shown that it was damaged: had the promised savings been realized, the City would have paid lower premiums. At the very least, the resolution of these counts depends on disputed issues of fact which must be decided at trial. Accordingly, the City asks this Court to deny Segal's motion for summary judgment, and for such other relief as the Court may deem just and proper.

Respectfully submitted,

**LAW OFFICES OF GEOFFREY R. ROMERO**

By: */s/ Geoffrey R. Romero*
        Geoffrey R. Romero
        4801 All Saints Rd. NE
        Albuquerque, NM 87120
        (505) 247-3338
        geoff@geoffromerolaw.com

        -and-

        Maureen Sanders
        SANDERS & WESTBROOK, P.C.
        102 Granite Avenue NW
        Albuquerque, NM 87102
        505-243-2243
        mas@sanwestlaw.com

        ***Attorneys for Plaintiff***

## CERTIFICATE OF SERVICE

I hereby certify that on this 8th day of February, 2023, I filed the foregoing Motion for Summary Judgment electronically through the CM/ECF system, which caused all parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing.

By: */s/ Geoffrey R. Romero*
        Geoffrey R. Romero