**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW MEXICO**

**CITY OF ALBUQUERQUE,**

       **Plaintiff,**

**v.**                                        **No. 1:21-cv-00349-JHR-GJF**

**THE SEGAL COMPANY (Western States),**
**a Maryland Corporation d/b/a Segal Consulting,**

       **Defendant.**

<u>**MEMORANDUM OPINION AND ORDER GRANTING THE SEGAL COMPANY'S**
**MOTION FOR SUMMARY JUDGMENT AND DENYING ALL OTHER PENDING**
**MOTIONS AS MOOT**</u>

This matter is before the Court on The Segal Company's Motion for Summary Judgment filed January 18, 2023. [Doc. 86]. The City of Albuquerque filed a Response in Opposition on February 8, 2023. [Doc. 95]. Segal filed a reply on March 1, 2023, completing the briefing. [Doc. 102]. For the reasons set forth below, the Court **GRANTS** Segal's Motion, [Doc. 86].

## I.       BACKGROUND AND PROCEDURAL HISTORY

The City of Albuquerque filed a Complaint against The Segal Company (Western States), Inc., a Maryland corporation d/b/a Segal Consulting, in New Mexico's Second Judicial District Court for breach of contract, negligence and negligent misrepresentation, and violation of New Mexico's Unfair Practices Act. [Doc. 1-1]. The City demanded compensatory and punitive damages, statutory treble damages, pre- and post-judgment interest, and costs including attorney fees. [Doc. 1-1].

The City alleged that it contracted with Segal for brokering and consulting services regarding employee health benefits. [Doc. 1-1, pp. 1-2]. With Segal's help, the City adopted a self-funded employee health program. [Doc. 1-1, p. 2]. Segal gave particular advice on setting

premiums and containing costs.  [Doc. 1-1, p. 2].  The City alleges that Segal gave it bad advice for fiscal year 2020, using incorrect data and flawed analysis.  [Doc. 1-1, pp. 2-3].  The City alleges that it "relied to its detriment on Segal's representations of its data analysis."  [Doc. 1-2, p. 6].  The City says that after Segal projected prescription costs for the year at $4.6 million, the City actually spent around $10 million.  [Doc. 1-1, p. 4].  The City demanded that Segal pay the difference, and Segal refused.  [Doc. 1-1, p. 4].

In Count I of its complaint, the City presents multiple theories of recovery in contract, specifically:  that Segal used incorrect data for its prescription drug cost projections for fiscal year 2020; that Segal failed to perform the contract in a "satisfactory and proper manner" as required; that Segal violated applicable professional standards; and that Segal violated New Mexico's implied covenant of good faith and fair dealing.  [Doc. 1-1, p. 5].  The City does not articulate any theory of causation other than its incorporation of the prior allegation that it "relied to its detriment on Segal's representations of its data analysis."  [Doc. 1-2, p. 6].

In Count II, negligence and negligent misrepresentation, the City alleges that Segal misrepresented that prescription drug costs would be $4.6 million with intent that the City rely upon that statement, which the City did.  [Doc. 1-1, p. 6].  The City alleges that Segal had "no reasonable ground … for believing" the projection and concealed its inaccuracy from the City, and that it knowingly misrepresented "that the discrepancy was a result of changing market conditions," but "[u]ltimately … acknowledged … it had failed to translate the sample set of data used in the RFP to a complete correct data set."  [Doc. 1-1, p. 6].  As with Count I, Count II does not allege any theory of causation independent of reliance.  *See* [Doc. 1-2, p. 6].

Segal removed the case to federal court on April 15, 2021.  [Doc. 1].  The parties agreed to U.S. Magistrate Judge Jerry Ritter as presiding judge.  [Doc. 9 text only].  Segal moved to

dismiss the Unfair Trade Practices claim on April 22, 2021, on the ground that governmental entities like the City do not have standing to bring a claim under the Act.  [Doc. 4].  Judge Ritter granted the motion and dismissed Count III on November 10, 2021.  [Doc. 17].  Segal filed an answer to the remaining counts of the complaint on November 24, 2021.  [Doc. 18].

Other motions are pending.  The City filed a motion to permit demonstrative evidence of mitigation of damages on January 26, 2023.  [Doc. 88].  The briefing was complete on February 24, 2023.  [Doc. 101].  Segal filed a motion to prohibit the City from using untimely supplementation as demonstrative evidence of mitigation on January 30, 2023.  (The parties treated this as a response to Doc. 88.)  [Doc. 90].  The briefing was complete on February 24, 2023.  [Doc. 101].  Segal filed a motion to exclude the testimony of the City's witness Charles DeWeese on February 7, 2023.  [Doc. 93].  The briefing was complete on March 7, 2023.  [Doc. 106].  The City filed a motion for partial summary judgment on liability on February 7, 2023.  [Doc. 94].  The briefing was complete on March 7, 2023.  [Doc. 107].

## II.      THE ARGUMENTS

Segal presents two primary arguments for summary judgment in its favor.  First, Segal asserts that the City knew that Segal's written projection of prescription costs of $4.6 million for fiscal year 2020 did not include all projected costs and so the City did not reasonably rely upon that number in either its decision to transition to a self-pay employee health program or its decision to set premium rates at 3.5%.  [Doc. 86, p. 1].[1]  Second, Segal asserts that The City did not suffer a loss in FY 2020 and thus has no claim in contract or tort against Segal.  [Doc. 86, p. 1].

---

[1] In a footnote, Segal argues that the City's claim of violation of the implied covenant of good faith and fair dealing fails due to lack of any evidence of bad faith or wrongful and intentional use of the contract to the City's detriment. [Doc. 86, p. 22 n. 6].  The City describes this argument as "otherwise undeveloped," [Doc. 95, pp. 11-12]; the Court agrees and will not address the sufficiency of the implied covenant claim other than within the argument for lack of damages.  *See, e.g., Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1161 (10th Cir. 2012) (inadequately briefed arguments not considered).

3

The City responds that it cannot discern Segal's exact argument on negligent misrepresentation, but then goes on to argue that the evidence prevents summary judgment on the elements related to truthfulness and reliance, which are the elements addressed in Segal's motion. [Doc. 95]. The City accurately notes the lack of any Segal argument on elements of breach of contract other than absence of damages. [Doc. 95, p. 17].[2] Finally, the City argues that "Segal misstates the City's damages theory, and it ignores the existence of concrete, non-speculative evidence that shows that Segal's conduct harmed the City." [Doc. 95, p. 22].

## III.    APPLICABLE LAW

### A.  Of Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it is essential to resolution of a claim under the applicable law. *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231-32 (10th Cir. 2001).

The movant has the initial burden to show that summary judgment is justified. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the movant argues failure of an essential element of a claim, a conclusory statement is insufficient, and the movant must make an evidentiary showing that the nonmovant lacks the necessary evidence. *See Halley v. Huckaby*, 902 F.3d 1136, 1143 (10th Cir. 2018). A "complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323-25. The nonmovant has the burden to show specific facts supporting essential

---

[2] The City characterizes its contract theories as three:  breach of contract; breach of the implied warranty to use reasonable skill; and breach of the covenant of good faith and fair dealing. [Doc. 95, p. 17]. The complaint cites unsatisfactory performance as a sub-theory of breach of contract but makes no mention of implied warranty to use reasonable skill. *See* [Doc 1-1, ¶ 39, p. 5].

4

elements of issues for which it has the burden of proof at trial. *Cardoso v. Calbone*, 490 F.3d 1194, 1197 (10th Cir. 2007).

Material facts in the movant's memorandum or the response that are not "specifically controverted" are deemed undisputed. D.N.M. LR-Civ. 56.1(b). Otherwise, the court views facts and evidence in the light most favorable to the opponent of summary judgment. *Hendrickson v. AFSCME Council 18*, 992 F.3d 950, 957 (10th Cir. 2021), *cert. denied*, 142 S. Ct. 423 (2021). When factual issues can reasonably be resolved in favor of either party, they cannot be resolved by the Court on summary judgment. *Anderson v. Liberty Lobby*, 477 U.S. 242, 250 (1986). A party cannot obtain a reasonable resolution in its favor upon only a "scintilla" of supporting evidence. *Id.*, at 248. On the record as a whole, if a rational factfinder could not find in favor of the nonmovant, then "there is no genuine issue for trial." *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 289 (1968).

## B. Of Breach of Contract

In New Mexico, "[t]he elements of a breach-of-contract action are the existence of the contract, breach of the contract, causation, and damages." *Abreu v. N.M. Children, Youth and Families Dep't,* 797 F.Supp.2d 1199, 1247 (D.N.M. 2011) (citing *Camino Real Mobile Home Park P'ship v. Wolfe,* 119 N.M. 436, 442, 891 P.2d 1190, 1196 (1995), overruled on other grounds, *Sunnyland Farms, Inc. v. Central New Mexico Electric Cooperative, Inc.*, 2013-NMSC-017, 301 P.3d 387).

## C. Of Negligence and Negligent Misrepresentation

New Mexico imposes liability for damages caused by a "negligent and material misrepresentation." NMRA, Civ. UJI 13-1632. The materiality prong requires proof that a defendant's statement was untrue, that the defendant intended that plaintiff rely upon it, and that

plaintiff did in fact rely upon it.  *Id.*  The negligent character is shown by proof that the defendant

had "no reasonable ground for believing that the statement was true."  *Id.*

## IV.   **ANALYSIS**

Segal does not clearly seek summary judgment on the issue of whether it breached its

contract with the City, so the Court assumes that there are triable issues of fact regarding breach.[3]

Instead, Segal's motion focuses on the elements of causation and existence of damages pertaining

to both the contract and negligent misrepresentation claims.  The causation issue is whether the

City reasonably relied upon the $4.6 million dollar figure for FY 2020 prescription claims when it

set its FY 2020 contribution (premium) rate at 3.5%; the damages issue is whether, as a result of

setting its contribution (premium) rate at 3.5%, the City suffered compensable damages in FY

2020.  If the undisputed facts demonstrate that the answer to either question is "no," then the City's

contract and tort claims both fail.  *See Abreu*, 797 F.Supp.2d at 1247 (elements of breach of

contract include causation and damages); NMRA, Civ. UJI 13-1632 (Elements of negligent

misrepresentation include causation and damages, as well as materiality of the defendant's

statement which is shown in part by defendant's intent that plaintiff rely upon it together with

plaintiff's reliance.).

### A.   **Undisputed Material Facts**

The Court's determination of what are undisputed material facts is set forth in detail in an

attached Appendix to this decision.  Pertinent to the issues of causation and damages, the material

undisputed facts are:

Pursuant to a contract for consultant services between Segal and the City, Segal obtained

and compiled employee health insurance cost information from bidding suppliers and presented

---

[3] The Court explains in footnote 1 why the issue of liability on the implied covenant of good faith and fair dealing is not properly presented.

the information to the City in a document called the "PBM RFP Analysis".  UMFs 1, 3-5.  "The City relied on Segal to do an analysis of the pharmacies' responses to the RFP for prescription drugs because the City (i.e. Mark Saiz) did not have the subject matter expertise to do that analysis.  'You needed a team of pharmacists to review and vet these.  That's why we contracted Segal.'"  AUMF R (citations omitted).

The PBM RFP analysis' "Financial Analysis" section "expressly stated that the cost projections did not include projections for certain categories of drug claims—i.e., those for which rebates would not be received ("Cost and Utilization exclude specialty, compound, OTC, and paper claims.") The Financial Analysis section included projections of the FY2020 costs for those prescription drugs for which the City could expect to receive rebates from drug manufacturers, as well as a projection of the amount of the rebates."  UMF 6 (original emphasis and internal citations omitted); *see also* AUMF D. "The Financial Analysis section identified that, for the categories of drug claims included in the analysis, the projected net cost after rebates for one of the vendors, Express Scripts ("ESI") was $4,600,600, which was the lowest of the four bidders."  UMF 7 (internal citation omitted).  "Segal had not performed an independent projection to calculate the [$4.6 million] number included in the Summary."  AUMF D (bracketed alteration supplied).  Segal provided the Financial Analysis section to the City's Purchasing Department by February 8, 2019. UMF 8.

ESI was chosen as the City's prescription vendor by an internal committee that did not have access to the Financial Analysis, but committee member Saiz received the Financial Analysis after the choice of ESI and "well before" the City set its FY 2020 contribution rate.  UMFs 9-10. Saiz reviewed the PBM RFP Analysis and the Financial Analysis in February, 2019, and, as a result, "he knew in February 2019 that the $4,600,600 projection was not a projection of the costs

of all of the prescription drug claims that would be incurred in FY2020, and that it excluded the cost of different categories of drugs."  UMF 11-12.  Nonetheless, Saiz used the $4.6 million number for modeling FY 2020 prescription costs.  UMF 13.  Saiz did not inform CFO Sanjay Bhakta that some prescription costs were excluded from the $4.6 million.  UMF 14.

In January and November of 2018, Segal provided models of transition to a self-funded program with contribution rate increases of 9%, 11%, 13% and 15%.  UMF 17.  The City did its own forecast at 15% in November, 2018.  UMF 18.  On February 8 and 11, 2019, Segal recommended in writing that the City set contribution rate increase at 8%, the equivalent of a rate for full insurance provided by a bidder.  UMFs 19-22.

In preparation for a discussion with CFO Bhakta about transitioning from fully-insured to self-insured, the City asked Segal on February 8, 2019, to "prepare a summary of the potential self-funded and fully-insured arrangements."  UMF 23.  The same day, "Segal responded that it was not going to 'be able to perform a rigorous update to the self-funded portion' because it was 'to[o] late to request any fresh data from Pres[byterian]… and complete it by Friday,' the day of the meeting with Mr. Bhakta. Segal further advised that, in putting together the requested summary, Segal was going to use 'the data Presbyterian and ESI presented in the RFP as a proxy.'"  UMF 24 (bracketed language and internal quotations in original; internal citations omitted).

In those communications, "Segal conditioned the use of the RFP data as 'proxy' based on Segal's 'recommend[ation] [that] we use the higher fully insured rates for funding.'  Mr. Saiz agreed with Segal conditionally using of the RFP data as a 'proxy' for purposes of the discussion and responded, '[y]es – that's fine.'"  UMF 25 (bracketed language and internal quotations in original; internal citations omitted).  Saiz knew that Segal proposed the "proxy" number because

it expected the City to set the contribution rate increase at the fully-insured equivalent of 8%. UMF 26.

On February 11, 2019, Segal sent the City a "Summary of Cost Analysis for effective dates of July 1, 2019-June 30, 2020" which used the proxy number for prescription costs. UMF 27. "The purpose of the Summary was to compare the value of going self-funded to remaining fully insured for FY20." AUMF B (citation omitted). The Summary was not created for the purpose setting a budget. UMFs 23, 24, 26, 29-30; *see* Segal response to AUMF B. "In the February 11, 2019, email attaching the Summary of Cost Analysis, Segal conditioned the use of the cost projection in the Summary of Cost Analysis, expressly advising the City that '[a]s long as we use the fully insured rates for budgeting, I don't think we need to do a more rigorous independent projection.'" UMF 28 (internal quotations in original; emphasis and citation omitted). "Mr. Saiz admitted that, based on Segal's February 11, 2019, email, he understood that if the City wanted to increase contribution rates by less than the amount of the fully-insured rate proposal, the City would need a new claims projection." UMF 29. On February 13, 2019, Saiz sent Segal the City's spreadsheets showing models at rates of 8%, 10%, and 15%. UMF 31. Segal responded to Saiz that the models were "in line with expectations," and that the sample fully-insured bidder was now quoting 8.7%. UMF 32. The City continued to use internal models at 8% or more throughout February, 2019. UMF 36.

"On Friday, February 15, 2019, Mr. Bhakta, Mr. Saiz and Mr. Petersen met to discuss the City's potential transition to a self-funded arrangement. During the meeting, Mr. Petersen advised Mr. Bhakta and Mr. Saiz again that the projected claim expenses reflected in the Summary of Cost Analysis were only 'proxies' or 'placeholder[s].' Mr. Petersen reiterated during the meeting that, if the City chose to transition to self-funding, the City should set contribution rates at the amount

of the fully-insured rate proposal. He also reiterated during the meeting that, if a contribution rate increase less than the fully-insured proposal was to be established, a more refined claim projection using fresh claims experience should be performed."   UMF 30 (citations omitted; internal quotations in original).   Bhakta recalls that he "asked Segal about the large difference between prescription costs for insured versus self-insured and asked how the self-insured costs could be so low. Segal responded that the difference was explained by the fact that under the self-insured plan, the City would be getting the rebates."  AUMF G.

After the February 15 meeting, Segal asked if the City wanted updated claims projections; the City did not ask for updates.  UMFs 34-35.  Nor did the City ask for an updated projection of reserves for FY 2020.  UMF 38.  On March 4, 2019, at the City's request, Segal provided a projection of employee contributions at the 8% rate.  UMF 39.

The City did not adopt Segal's recommendation to increase contributions by at least 8%. UMF 53.  Bhakta would not have accepted a rate of 10% or more.  UMF 70.  On March 13, 2019, while Saiz was on vacation, Bhakta asked City staff to model a 3.5% contribution rate increase. UMF 43-45.  The City's projection showed a $5.9 million reserve with the 3.5% rate.  UMF 46. Saiz discussed the 3.5% City projection with Bhakta and knew it relied on the $4.6 million "proxy" number for prescription costs but did not remind Bhakta that Segal recommended updating the cost projections if the rate was less than 8%.  UMFs 47-48, 56.  Bhakta decided to adopt the 3.5% rate for the City's budget considering various factors including "(i) the 'effect of any [] increases on employees,' including the financial impact on employees 'in light of the [City's] cost of living adjustment,' and (ii) the 'effect[] [of the increase] on the other participating entities and their employees,'" as well as "the financial needs of other City departments" given that the City provided 80% of total plan contributions.  UMFs 51-52 (internal quotations in original; citations

omitted).  Bhakta knew that Segal recommended a higher contribution rate increase but felt that 3.5% would generate a sufficient reserve.  UMF 55.  The City announced the 3.5% rate increase to employees and other affected employers without first asking Segal to review its internal model.  UMFs 54, 57-58.

In October, 2020, Saiz and Bhakta told the City Council's committee overseeing the health plan that the "transition from fully insured to self-funded was completely successful" and that "[t]he cost for medical and prescription care was in line with anticipated projections, fluctuations and trends" because "because the 'combined' or 'overall' costs of medical claims, prescription drug claims, and other expenses fell within 'the combined projection, where we should have been combined.'"  UMFs 59-60 (internal citations omitted).  They reported to the committee that the City already saved over $8 million in FY 2020 compared to the cost of remaining fully insured.  UMF 61.  At the end of 2020, Segal recommended a contribution increase of 5.8% for FY 2022 but Bhakta rejected the recommendation, again adopting a 3.5% increase.  UMF 77-78.  By February 8, 2021, the successor consultant to Segal reported that the transition saved the City over $12 million.  UMF 62.  For FY 2020 as a whole, combined expenses for all employee health care were almost $6 million less than budgeted, and the year-end reserve was $1 million more than projected.  UMFs 63-66.

"Bhakta admitted that he could only speculate" what contribution rate he would have set if he had obtained a higher projection of prescription costs.  UMF 67.  He "did not know if he would have wanted the City to contribute an additional $3.5 million to the Plan for FY2020."  UMF 71. "Saiz prepared a chart showing that if the City had been provided in February 2019 a higher projection for prescription drug claims for FY2020, the City would have targeted an 11% contribution increase to (a) collect $5,645,518 more in premium and (b) seek an end-of-year

reserve of approximately $6.4 million." UMF 69 (citations omitted). The actual "FY2020 end of year reserve of $6.9 million was higher than the $6.4 million projection prepared by Mr. Saiz." UMF 72. The successor consultant to Segal said that the City was "over reserved" at the end of FY 2020. UMF 74. The reserve increased to over $9 million through FY 2021. UMF 76.

**B. Whether the Undisputed Facts Show that the City Did Not Reasonably Rely upon the $4.6M Number for Prescription Claims Costs.**

Segal's argument is that the City did not reasonably rely on the $4.6 million dollar projection for prescription claims costs for FY 2020 in Segal's Summary of Cost Analysis, but instead was aware based on Segal's express disclosure that there would be substantial costs above the projected amount. [Doc. 86, p. 21]. Segal asserts that it counseled one of two approaches: either set a contribution (premium) rate increase as if the City was purchasing insurance (*i.e.*, at 8% or higher) or, if a lower rate was the goal, consider obtaining a new projection based on actual claims experience. [Doc. 86, pp. 19-20].

It is important to the story, but not determinative of the issues, that Segal's disclosures about the limitations of the claims cost projection were presented to the City's Insurance and Benefits Manager Mark Saiz, but the decision to set the contribution rate increase at 3.5% for FY 2020 was made by the City's Chief Financial Officer Sanjay Bhakta. Saiz admitted that Segal presented the limited projections "only because" Segal expected the City to adopt an equivalent of a fully-insured contribution rate. [Doc. 86, p. 23]. While Segal adopts Bhakta's admission that Saiz did not explain to Bhakta the limitations on Segal's projections [Doc. 86, pp. 21-22], it also asserts that it explained in a meeting with both Saiz and Bhakta that the $4.6 million projection was a "proxy" or "placeholder," that it recommended setting contribution rates as if fully insured, and it recommended refining the projection if a lower contribution rate increase was expected. [Doc. 86, p. 20].

Segal argues that, notwithstanding Bhakta's lack of knowledge, "the City" was fully aware through Saiz and cannot look to Segal for redress for its bad internal communications.  [Doc. 86, p. 2].  Segal also notes that the City ran internal models at 8% for four weeks after receiving the limited projection of claims costs, until Bhakta directed adoption of 3.5% while Saiz was on vacation.  [Doc. 86, p. 20].  Upon his return, Saiz did not challenge Bhakta's decision.  [Doc. 86, p. 24].  And Bhakta did not ask Segal for input on his decision to set the contribution at 3.5%. [Doc. 86, p. 21].  In sum, Segal says that the City did not act in reliance on Segal's advice, but knowingly ignored it.  [Doc. 86, pp. 21-22.

The City focuses on the presentation on February 15, 2019, where, it says, Segal projected that "FY 2020 prescription costs would be $4.6M," which was "not true." [Doc. 95, p. 14].  In addition, "Segal never had any reasonable ground to believe that $4.6M was an accurate number." *Id.*  The City argues that Segal "misrepresented the nature of the Summary itself" as "a correct indication of the savings the City would realize from rebates."  [Doc. 95, p. 14].  The City says Segal "contends that it had given the correct information to Mr. Saiz, and it was Mr. Saiz who bears the fault for not informing Mr. Bhakta that the information provided at the February 15 meeting was incomplete and could not be relied upon."  *Id.*, citing Segal's UMFs 11-14. Ultimately, the City says, "Segal's use of a number that was inaccurate at the February 15 presentation, along with its assurances that the inaccurate projection could be relied on, were material misrepresentations, and Segal knew it."  [Doc. 95, p. 16].

In support of reliance in particular, the City asserts that "Segal intended that the City rely on both the Summary and the incorrect projection that it contained."  [Doc. 95, p. 16].  More specifically, the City says, "Segal created and presented the Summary to the City specifically to assist the City in deciding whether to self-insure."  [Doc. 95, p. 16], citing the City's AUMF B.

On the other hand, the City's pleadings and briefing repeatedly allege that the City relied upon the Summary in setting the 3.5% rate increase for FY 2020. *See, e.g.,* Complaint, Doc. 1-1, p. 3 ("The City relied on Segal's data analysis regarding anticipated prescription costs in establishing its premium charges for the prescription benefits for plan members."); Response to Motion, Doc. 95, p. 22 ("The City's damages argument is straightforward: the flawed prescription projections that Segal presented caused the City to set a premium increase too low, lower than it would have if correct data was provided.").

In summary, the totality of the prescription cost information and recommendations provided by Segal were:  the amount of $4.6 million, transported from the lowest prescription claim bid but excluding "specialty, compound, OTC, and paper claims", UMF 6, and net of projected rebates, UMF 7, was an acceptable "proxy" or "placeholder" in the absence of real self-insured claims experience if and only if the City increased contribution rates by 8% or more, as informed by the comparable fully-insured bid. On the other hand, if the City intended to increase rates by less than 8%, Segal recommended refining the projection with actual claims and enrollment experience.  UMFs 28-29; *see also* [Doc. 86-11] (Summary of Cost Analysis and cover email, Exh. 11 to Motion).

The City's reductionist claim that Segal represented that "FY 2020 prescription costs would be $4.6M" is not supported by reasonable inference from any admissible evidence. Moreover, Segal clearly and repeatedly conditioned reliance upon the $4.6M "proxy" number on setting a contribution rate increase of 8% or more.  The City, through its Chief Financial Officer, knowingly rejected that condition by setting the rate increase at 3.5%.  The record contains no evidence that Segal made any representation that the City could rely on $4.6 million in prescription

costs if it set a rate below 8%. Segal's concerns about the reliability of the $4.6 million number were a part of its representations and recommendations to the City but were disregarded.

The analysis of liability in contract requires existence of a contract, which is not disputed, and breach, which is disputed but can be assumed for purposes of this motion because Segal's reliance argument goes to the third element: causation. There is no genuine dispute that the City acted contrary to, not in reliance upon, Segal's recommendation to use the "proxy" number only if setting a rate increase of 8% or more. The City's factual assertion that Segal's recommendation of the "proxy" number was unconditional is supported by no evidence upon which a rational juror could rely. Segal is entitled to summary judgment on the contract claim due to lack of evidence of causation.

The analysis of liability for negligent misrepresentation incorporates reliance into two elements: defendant's intent that plaintiff rely upon defendant's negligent misrepresentation; and plaintiff's reliance in fact upon the same. For the same reasons as the contract analysis, the City's claim fails. There is no genuine issue of fact that Segal recommended use of the proxy number only if setting a rate increase of 8% or more, and so no rational juror could find that Segal intended that the City rely upon prescription costs of $4.6 million while setting a rate increase less than 8%. Additionally, there is no evidence upon which a rational juror could find that the City relied upon Segal's recommendation when it set the 3.5% rate. Segal is entitled to summary judgment on the contract claim based on lack of evidence of reliance (as well as intent to cause reliance).

**C.   Whether the Undisputed Facts Show that the City Did Not Suffer Damages.**

Segal's argument is, notwithstanding the City's allegations of contractual and tortious wrongdoing by Segal, the City cannot prove that it was harmed: the City successfully transitioned to a self-insured plan which "improved the City's financial condition by $12.5 million dollars."

15

[Doc. 86, p. 25].[4]  Even at the 3.5% contribution increase, FY 2020 costs were "in line with" projections, and the City received enough money to pay all its self-insured expenses and accumulate a higher than anticipated (and arguably excessive) reserve.  [Doc. 86, pp. 22-25]. Rather than lose money, Segal says, the City met its goals while saving money, because its own contributions were tied to the lower 3.5% rate.  [Doc. 86, p. 25].  Segal says that the City's own damages model, presented through a chart prepared by Saiz, assumes a contribution rate higher than Bhakta was willing to set, and contributions by the City at a higher level than he could endorse.  [Doc. 86, p. 27].

The City's "straightforward" damages claim is that, because of Segal's flawed projections,[5] it set the FY 2020 contribution rate increase too low, reducing the FY2020 reserve though it was still "sufficient" because of lower claims experience due to COVID, and had to raise premiums in later years to catch up.  [Doc. 95, pp. 22-23].  The City relies upon three proposed Additional Undisputed Material Facts (N, O and Q) which the Court determined were disputed.  The City says that "Segal's argument fails once the subsequent fiscal years are taken into account."  [Doc. 95, p. 23].

A summary follows of the undisputed facts relevant to whether the City suffered damages.

The City decided to go forward in FY 2020 with a 3.5% increase in the contribution rate, projecting that they would end the year with a $5.9 million reserve.  UMFs 46, 51-52.  Chief Financial Officer Bhakta made the decision considering factors including the effect on employees as well as other participating entities and their employees, and the needs of other City departments,

---

[4] Although it claims to have to guess at the focus of Segal's argument that it suffered no damages, the City "assumes that Segal's damages argument (Part II of its argument) is meant to apply to both counts one and two."  Doc. 95, p. 13.  The Court assumes the same.

[5] Discrete analysis of the "no damages" argument requires the Court to assume, contrary to the preceding analysis, that the City could prove liability in contract and for negligent misrepresentation.

recognizing that the City would be funding 80% of employee health plan contributions.  UMFs 51-52.  Bhakta knew that Segal recommended an 8% or higher increase in the contribution rate, but Bhakta thought that 3.5% would generate a "sufficient" reserve.  UMF 55.  In October, 2020, Saiz and Bhakta described the transition to self-funding as "completely successful" and described health plan costs at that time as "in line with anticipated projections" because its combined expenses (medical claims, prescription claims, and other expenses) fell within the combined projection, saving the City over $8 million compared to remaining fully insured.  UMFs 59-61.

At the end of calendar year 2020, Segal recommended that the City increase contribution rates for FY 2022 by 5.8%; Bhakta rejected that recommendation and kept the increase at 3.5% for FY 2022.  UMF 77-78.  In early February, 2021, after the City terminated Segal's contract, Segal's successor calculated that the savings from the transition to self-funding had increased to at least $12 million.  UMF 62.  At the end of FY 2020, combined expenses for employee health care were almost $6 million less than budgeted, and the year-end reserve was $6.9 million, or $1 million more than projected.  UMFs 63-66, 69.  Segal's successor said the City ended FY2020 "over reserved.  UMF 74.  At the end of FY 2021, reserves had increased to $9 million.  UMF 76.

The City's argument is that because of Segal's conduct it set the FY 2020 contribution rate too low, creating a need to increase premiums in later years to "catch up" on its reserve targets.  The Court has already determined that the City's decision to set FY 2020 rates at 3.5% was not the result of reliance upon Segal's representations.  The damages question is whether there is a disputed issue of fact material to whether the City set the FY 2020 rate too low, assuming only for the sake of the argument that the decision is attributable to Segal.  Two City claims require analysis.

The first argument is built on two proposed Additional Undisputed Material Facts which the Court rejected as disputed, but which are relevant to the question of whether there are disputed issues of fact which prevent summary judgment on damages.  In AUMF N, the City asserts that it would "likely" have set the FY 2020 contribution rate increase at 7% or higher if it had "correct" data from Segal.  In AUMF O, the City asserts that, because it set a lower 3.5% rate increase for FY 2020, it had a smaller reserve that it could have had, which was a causal factor in subsequent decisions to raise rates.  Those assertions, if supported, would create genuine issues of material fact.

The City cites the deposition testimony of CFO Bhakta for the assertion that it would "likely" have set a higher FY 2020 rate increase with "correct" information.  But when asked what rate he would have chosen, Bhakta said only, "I can't speculate, but it definitely would have been more," and "[i]t could have been" around 7%.  [Transcript, Doc. 95-9, p. 12 (internal page 210, lines 14-22)].  Bhakta also testified that, because of his reliance on Segal's data, the City had about $6 million less in reserves for each of four fiscal years beginning in FY 2020.  [Response Exh. I, Transcript, Doc. 95-9, p. 11 (internal pages 206, line 18, to 207, line 8)].  The City also cites an internal spreadsheet from May, 2019, showing the projected reserve of $5.9 million at a 3.5% rate increase, and at $9.1 million if the rate increase had been 8%.  [Response Exh. O, Doc. 95-15, p. 2].  Finally, the City relies upon the conclusions of its expert actuary, which in relevant part are:

> [The City] ran the risk of running out of money to pay claims in the 2020 fiscal year.  That did not happen because of low claims in April, May and June 2020 because of the pandemic.  However, the risk was significant, and prior to the pandemic, the claims experience appeared adverse.
> [The City] set a premium level that was lower than they would have set if they had received an accurate projection in the first place.  That resulted in lower reserves than they would have otherwise have had, and the need to increase future rates by more than they would otherwise have had to do. [The City] was harmed in having to set higher future rates, because their resources are finite and they were not able to fund other programs because of the shortfall in self-funded insurance reserves.

[Response Exh. E, DeWeese Report, Doc. 95-5, pp. 9-10].

Isolated from its unsupported allegations of reliance upon misrepresentations by Segal, the City's damages argument is that, if it had known that net employee prescription expenses would be greater than $4.6 million in FY 2020, it would have increased rates by more than 3.5% for that year, thus generating a larger reserve, which then would have allowed it to reduce the rate increases it imposed in three subsequent years.  Even though the City's assertions create an issue of fact on their face, they are rife with speculation and cumulatively fail to reach even the level of a scintilla of evidence.  *See Anderson*, 477 U.S. at 250.  For example, Bhakta's testimony that he could only speculate about what rate increase he would have imposed, but it would have been at least 7%, implies that he would have doubled the cost of the program to the City, its associated employers, and all of their employees, solely to gather reserves of an additional $6 million each year when (1) the City accumulated reserves in excess of its target in FY 2020, UMFs 65 and 72, and (2) the City's successor consultant projected that the City would remain over-reserved even at a 5% contribution rate increase for FY 2021 and beyond.  [Doc. 86-26, p. 2].  Bhakta himself testified that "the City did not want to over reserve and thereafter put in extra dollars to the health fund if not needed."  UMF 75.

At the end of 2020, Segal recommended an increase of 5.8% for FY 2022; Bhakta rejected that recommendation and kept the increase at 3.5% intending to reduce reserves by setting rates below the amount that would pay projected costs.  UMF 77-78.  Moreover, Bhakta testified that setting rates involved consideration of multiple factors, including costs to employees and to other participating employers, and the effect on funds available to other City purposes.  UMF 51-52.  Each of those additional factors would weigh in favor of lower, not higher, rates.  Ultimately, with reserves higher than needed or projected, and the burden of rate increases falling on employees,

other participant employers, and competing City programs, the speculation that Bhakta would have decided to divert an additional $6 million per year for reserves defies logic.

The City's second argument for damages is that its FY 2020 experience was shaped by the COVID epidemic which suppressed employee health claims below what they would have been. The implication is that Segal was fortunate that the FY2020 experience concealed the true harm it caused, which would only become apparent in subsequent years. The City presents this argument in its brief, [Doc. 95, 22-23] and in a proposed Additional Undisputed Material Fact that the Court did not adopt, finding that it was disputed. *See* Appendix, AUMF Q. For purposes of this analysis, however, it is enough to assume that reasonable jurors could find at trial that the primary, or at least a substantial, reason for the lower health plan claims in FY 2020 was the COVID pandemic. The City retains the same damages model: but for Segal's conduct, it would have imposed a higher increase in contribution rates and then collected even more reserves in FY 2020 and thereafter than it did. Yet, the lost opportunity to collect more reserves is not a source of damages when actual experience for FY 2020 was collection of too much in reserves, to the extent that Bhakta (contrary to Segal's December 2020 recommendation) maintained the 3.5% contribution rate increase in FY 2022 for the specific purpose of reducing reserves to bring them better in line with projections.

Finally, claims experience, employee wage pressure on the City and associated employers, and the needs of competing City departments, as well as the general public health climate to the extent that it affects the health of employees, are factors which the City acknowledges play a significant part in the performance of the health plan and the City's management decisions. UMF 51-52; proposed AUMF Q. Nowhere has the City presented any evidence isolating the effect of Segal's conduct from the effects of these and any other apparent drivers of the plan's experience. Beyond FY 2020, the City has presented no model that isolates the effects of its FY 2020 decisions

from subsequent decisions it made independently of its previous relationship with Segal. The City asks that the finder of fact conclude that any negative variance from the City's expectations is the result of recommendations made by Segal in February and March of 2019. No rational fact finder could draw that conclusion from the available evidence.

In summary, recognizing that the City demonstrated genuine issues of fact about what decisions it would have made and what results it would have achieved if things were different, it has nevertheless failed to show that a rational trier of fact could find by a preponderance what actual damages were caused by Segal's representations in connection with the FY 2020 rate increase decision. *Anderson*, 477 U.S. at 250. Summary judgment for Segal on both Counts I and II should be granted for lack of proof of damages.

## V.   CONCLUSION AND ORDER

For the foregoing reasons, the Court **ORDERS**:

1.   **SUMMARY JUDGMENT IS GRANTED TO DEFENDANTS ON COUNTS I AND II**, the only remaining claims at issue.

2.   There being no surviving claims, **OTHER PENDING MOTIONS ARE DENIED AS MOOT [Docs. 88, 90, 93, and 94].**

3.   The case is **DISMISSED WITH PREJUDICE**.

4.   Judgment shall issue accordingly.

**IT IS SO ORDERED.**

_____
**JERRY H. RITTER**
**U.S. MAGISTRATE JUDGE**
**PRESIDING BY CONSENT**

21

**APPENDIX: Determination of Undisputed Material Facts**

| Per Segal | Per The City | RESOLUTION |
|---|---|---|
| 1. Under the contract in effect during 2018-2020, Segal was to provide "consultant services for Employee Health Benefits" in a "satisfactory and proper manner." See Ex. 1, Segal Contract with City at COA00019986. Among other consulting services, Segal was engaged to: • "Assist with the development, issuance and evaluation of a detailed Request for Proposal ["RFP"] for employees benefits"; • "Prepare a detailed written report analyzing all proposals received"; and • "Review and analyze premium rates and make recommendations to contain costs." Id. at COA00020014 at §§ 3.1.1; 3.1.2; 3.1.3. | Undisputed. [Doc. 95, p. 2] | **UNDISPUTED**. |
| 2. In January 2018 and November 2018, Segal provided presentations to the City with information regarding the potential transition of its fully-insured health plan to a self-funded health plan. See Ex. 2, November 8, 2018 Presentation; Ex. 3, January 12, 2018 Presentation | Undisputed. [Doc. 95, p. 2]. | **UNDISPUTED**. |
| 3. In the fall of 2018, the City authorized Segal to prepare an RFP for both fully insured and self-funded service providers for its health plan for FY2020. See Ex. 4, City of Albuquerque's Response | Undisputed. [Doc. 95, p. 2]. | **UNDISPUTED**. |

22

| Per Segal | Per The City | RESOLUTION |
|---|---|---|
| to Segal's First Set of Interrogatories at Interrog. No. 1. | | |
| 4. In order to compare the RFP responses submitted by "pharmacy benefit managers" a/k/a "PBMs" to administer the prescription drug component of a self-funded arrangement, Segal provided on February 8, 2019 a report titled "Pharmacy Benefits Management Services Requests for Proposal (RFP): Proposal Evaluation and Results Presentation" (the "PBM RFP Analysis"). Ex. 5, PBM RFP Analysis. | Undisputed.  [Doc. 95, p. 2]. | **UNDISPUTED**. |
| 5. The PBM RFP Analysis included a "Financial Analysis" section comparing the financial components of the PBM bidders' RFP responses. Id. at 7. | Undisputed.  [Doc. 95, p. 2]. | **UNDISPUTED**. |
| 6. The Financial Analysis section that was provided to the City expressly stated that the cost projections did not include projections for certain categories of drug claims—i.e., those for which rebates would not be received. Id. ("Cost and Utilization exclude specialty, compound, OTC, and paper claims.") (emphasis supplied). The Financial Analysis section included projections of the FY2020 costs for those prescription drugs for which the City could expect to receive rebates from drug | The Financial Analysis section of the PBM RFP Analysis did not state that the cost projections not included were those for which rebates would not be received. It merely stated that "Cost and Utilization exclude specialty, compound, OTC, and paper claims."(MSJ Ex. 5 at 7). | **UNDISPUTED**.  The City's comment is immaterial considering the totality of Segal's assertion. |

| Per Segal | Per The City | RESOLUTION |
|---|---|---|
| manufacturers, as well as a projection of the amount of the rebates. Id. | | |
| **7.** The Financial Analysis section identified that, for the categories of drug claims included in the analysis, the projected net cost after rebates for one of the vendors, Express Scripts ("ESI") was $4,600,600, which was the lowest of the four bidders. Id. | Undisputed.  [Doc. 95, p. 2]. | **UNDISPUTED**. |
| **8.** The City's Purchasing Department had access to the Financial Analysis section of the PBM RFP Analysis on or before February 8, 2019 and worked with Segal to score the RFP responses. See Ex. 4 at Interrog. 1; Ex. 6, Saiz Tr. at 54:4-17, 59:15-60:6. | Although the City's Purchasing Department had access to the Financial Analysis section of the PBM RFP Analysis as an advisor to the ad hoc committee evaluating the RFP responses, its role was limited to insuring compliance with the procurement requirements. (Ex. N, Saiz Tr. at 53:10-12) Segal was the subject matter expert hired to understand and evaluate the medical and prescription pricing because the City lacked that expertise and Segal assigned a score to the respondents and provided that score to the committee. (Id. at 51:24-52:18, 54:21-24). | **UNDISPUTED BUT** The City's response raises an issue regarding the materiality of access by the "Purchasing Department" and whether either knowledge can thereby be imputed to Albuquerque decision-makers or reliance is rendered more or less reasonable by the Purchasing Department's access. |
| **9.** In addition to the City's Purchasing Department, the City had a committee that reviewed the RFP responses. The members of the City's committee, which included Mr. Saiz, initially did not have access to the Financial Analysis section of the PBM RFP Analysis. See Ex. 4 at | Undisputed.  [Doc. 95, p. 2]. | **UNDISPUTED**. |

| Per Segal | Per The City | RESOLUTION |
|---|---|---|
| Interrog. No. 1.; Ex. 6, Saiz Tr. at 54:4-19. | | |
| **10.** After the City committee selected ESI as the PBM, but well-before the City set the contribution rate for FY2020, Mr. Saiz was granted access to the Financial Analysis section of the PBM RFP Analysis. Ex. 6, Saiz Tr. at 56:20-58:1, 60:19-61:5. | Undisputed.  [Doc. 95, p. 2]. | **UNDISPUTED.** |
| **11.** Mr. Saiz admitted that, in February 2019, he reviewed both ESI's RFP Response and the Financial Analysis Section of Segal's PBM RFP Analysis. Id. at 61:8-20. | Undisputed.  [Doc. 95, p. 2]. | **UNDISPUTED.** |
| **12.** Mr. Saiz admitted that, based on his review of Segal's disclosures in the PBM RFP Analysis, he knew in February 2019 that the $4,600,600 projection was not a projection of the costs of all of the prescription drug claims that would be incurred in FY2020, and that it excluded the cost of different categories of drugs. Id. at 139:16-140:16. | Undisputed.  [Doc. 95, p. 2]. | **UNDISPUTED.** |
| **13.** Mr. Saiz admitted that he continued to use the $4,600,600 projection to model contribution increases even after he had learned that the projection did not include the cost of all of the prescription drugs. Id. | Mr. Saiz and Mr. Bhakta continued to use the $4.6M projection to model contribution increases even after they learned that the projection did not include the cost of all of the prescription drugs because they understood that the $4.6M cost was the lion's share of the drug claims "because the compound, the specialty, the over-the-counter, as I understand, [were a] very | **UNDISPUTED.** The City's response does not negate the plain meaning of Segal's factual statement. |

25

| Per Segal | Per The City | RESOLUTION |
|---|---|---|
| | small percentage of the overall cost." (Ex. N, Saiz Tr. at 140:11-16) The ESI proposal as Mr. Saiz understood it was a $9.6 million gross cost with a $4.3 million rebate to get to the $4.6 million amount. (Id. at 140:23-141:1) | |
| **14.** Mr. Saiz never informed Mr. Bhakta that he knew that the $4,600,600 projection excluded certain categories of drugs. See Ex. 7, Bhakta Tr. at 135:2-7, 216:21-217:21. | Undisputed.  [Doc. 95, p. 2]. | **UNDISPUTED**. |
| **15.** In the decks that Segal provided to the City in January and November 2018 regarding the transition to self-funding, Segal expressly recommended that "the City of Albuquerque fully fund their [Incurred But Not Reported "IBNR"] obligation in the first year of self-funding" and that, in addition, "a claim fluctuation reserve be funded as soon as reasonably possible." See Ex. 2 at 17-18; Ex. 3 at COA00077242-43 (emphasis in original).  (footnote explanation of "IBNR" omitted) | Undisputed.  [Doc. 95, p. 2]. | **UNDISPUTED**. |
| **16.** In the November 2018 deck that Segal provided just three months before the City moved to a self-funded arrangement, Segal estimated that the "[City] would need to reserve for IBNR approximately $5.3M." See Ex. 2 at 16. It described that the claims fluctuation reserve | Segal estimated that the City would need to reserve approximately $5.3M for IBNR, and that the claims fluctuation reserve target was between one and two months of paid claims. However, Segal had also advised the City that it could take several years to | **UNDISPUTED**. The City's response does not negate the plain meaning of Segal's factual statement. |

26

| Per Segal | Per The City | RESOLUTION |
|---|---|---|
| target was between one and two months of paid claims. Id. at 18. | hit the desired reserve. (Ex N, Saiz Tr. at 105:5-7) | |
| **17.** In the January 2018 and November 2018 decks, Segal modeled contribution rate increases of 9%, 11%, 13% and 15% for the first fiscal year associated with the City's potential transition to a self-funded health plan. See Ex. 2 at 19; Ex. 3 at COA00077244-46. | Undisputed.  [Doc. 95, p. 2]. | **UNDISPUTED.** |
| **18.** In November 2018, the City itself forecasted a 15% contribution rate increase for FY2020. See Ex. 8, November 8, 2018 Email from Tanya Gallegos to Jayne Aranda at 2. | The City forecasted a 15% contribution rate increase for FY20 in November 2018 as part of its budget process and five-year forecast. That forecast was not used when setting premiums. (Ex. N, Saiz Tr. at 59:4-7; 163:23-164:7) | **UNDISPUTED.** The City's response does not negate the plain meaning of Segal's factual statement. |
| **19.** In connection with RFPs issued in 2018, another vendor, Presbyterian Health ("Presbyterian") submitted responses for a fully-insured arrangement (medical and prescription drugs), fully-insured medical only plan, and, a self-funded medical only plan. Ex. 4 at Interrog. No. 1; see also Ex. 9, Petersen Tr. at 28:21-29:20; Ex. 10, Plaintiff's Responses to Segal's First Set of Requests for Admissions at RFA No. 1 | Undisputed.  [Doc. 95, p. 2]. | **UNDISPUTED.** |
| **20.** The City knew on or about February 11, 2019 that Presbyterian's proposal for a fully-insured plan for FY2020 was based on a rate increase of 8% or higher. Id. | Undisputed.  [Doc. 95, p. 2]. | **UNDISPUTED.** |

| Per Segal | Per The City | RESOLUTION |
|---|---|---|
| | While Exhibit 12 included a recommendation from Segal to use the "higher fully insured rates for funding," Exhibit 11 contains no such recommendation. What Segal meant by "higher fully insured rates for funding" is unclear given that the rates proposed by Presbyterian for a fully-insured rate included profit which was not an appropriate factor for a self-insured program. (Saiz Tr. at 94:25-95:16) In fact, Mr. Saiz understood that a fully insured rate increase of 8.7% would translate to a rate of 7% increase if the City went to self-insured and did not have to provide for profit. (Id.) | **UNDISPUTED.** Exhibit 11 contains the statement, "As long as we use the fully insured rates for budgeting, I don't think we need to do a more rigorous independent projection." In context, it is the equivalent of a written recommendation to set contribution rates at the fully-insured rate equivalent. The City provides no foundation for an inference that Segal shared the City's expectation to reduce the "fully-insured" recommendation to a non-profit equivalent. |
| **21.** On February 8, 2019 and February 11, 2019, Segal recommended in writing that the City increase contribution rates by the same amount as the fully-insured rate proposal. Ex. 11, February 11, 2019 Email from Segal's Gary Petersen, the lead consultant, to Mark Saiz and Tim Rivera at 1; Ex. 12, February 8, 2019 Email from Mark Saiz to Gary Petersen at SEGAL_00008657. | | |
| **22.** The City admitted that Segal recommended that the City implement a contribution rate increase of 8% for FY2020. See Ex. 10, Plaintiff's Responses to Segal's First Set of Requests for Admissions at RFA No. 6. | Undisputed.  [Doc. 95, p. 2]. | **UNDISPUTED.** |
| **23.** On February 8, 2019, the City requested that Segal prepare a summary of the potential self-funded and fully-insured arrangements to facilitate a February 15, 2019 discussion with the City's CFO, Sanjay Bhakta, regarding a transition from a fully-insured arrangement to a self-funded arrangement. See Ex. 6, Saiz Tr. at 64:15-65:4, 67:20-25, 70:2-10. | Undisputed.  [Doc. 95, p. 2]. | **UNDISPUTED.** |

| Per Segal | Per The City | RESOLUTION |
|---|---|---|
| **24.** On February 8, 2019, Segal responded that it was not going to "be able to perform a rigorous update to the self-funded portion" because it was "to[o] late to request any fresh data from Pres[byterian]… and complete it by Friday," the day of the meeting with Mr. Bhakta. Ex. 12 at SEGAL_00008657. Segal further advised that, in putting together the requested summary, Segal was going to use "the data Presbyterian and ESI presented in the RFP as a proxy." Id. | Undisputed.  [Doc. 95, p. 2]. | **UNDISPUTED**. |
| **25.** Segal conditioned the use of the RFP data as "proxy" based on Segal's "recommend[ation] [that] we use the higher fully insured rates for funding." Id. Mr. Saiz agreed with Segal conditionally using of the RFP data as a "proxy" for purposes of the discussion and responded, "[y]es – that's fine." Id. | Segal's use of the incorrect projection was not "conditioned" on anything. While the communications described in these UMFs took place, Segal included no conditions in its presentation, and in fact repeatedly assured the City's CFO that they could be relied on at the February 15, 2019 meeting. (AMF G) | **UNDISPUTED**. The City's response disregards the highlighted text in Segal's Exhibit 11: "As long as we use the fully insured rates for budgeting, I don't think we need to do a more rigorous independent projection.  If we are going to set rates at something less than the fully insured proposal, we may need to take the time to do a more refined projection using fresh claims experience and enrollment (which I would love to avoid if we could just due to the time it would require to collect and process all the data)." "As long as" and "If we are" are conditional phrases qualifying the |

| Per Segal | Per The City | RESOLUTION |
|---|---|---|
| | | remainder of each sentence. |
| **26.** Mr. Saiz admitted that he knew that Segal was providing the summary to the City using the RFP financial data as a proxy "only because" Segal thought the City would be increasing the contribution rates for FY2020 by the amount of the fully-insured rate proposal. See Ex. 6, Saiz Tr. at 65:5-12, 66:8-12. | Undisputed. [Doc. 95, p. 2]. | **UNDISPUTED**. |
| **27.** On Monday, February 11, 2019, Segal's lead consultant, Gary Petersen, sent the City a document titled "Summary of Cost Analysis." Ex. 11 at 1-2. Consistent with Segal's February 8, 2019 email describing that the summary would use the data ESI presented in the RFP as a proxy, the column that reflected the self-funded arrangement used the $4,600,600 prescription drug claims projection from the ESI RFP bid. Id. at 2. | The February 8 email described that the Summary would use "the data ESI presented in the RFP as a proxy." (MSJ Ex. 12) But the data ESI presented in its RFP bid included more drug claim projections than that reflected in the Summary as $4,600,600 net of rebates. Segal subtracted items out of ESI's proposal to arrive at the incorrect $4.6M projection that it used as a placeholder. (AMFs B-D, H) | **UNDISPUTED**. The City's response does not contradict Segal's assertions of fact. The highlighted portion of the Exh. 11, p. 2, explains that "Self Funded Rx Claims are net of projected rebates based on Segal analysis of ESI RFP responses, and assumes all rebates will be deposited into the Health Plan Fund." |
| **28.** In the February 11, 2019 email attaching the Summary of Cost Analysis, Segal conditioned the use of the cost projection in the Summary of Cost Analysis, expressly advising the City that "[a]s long as we use the fully insured rates for budgeting, I don't think we need to do a more rigorous independent projection." Id. at 1 (emphasis supplied). | Segal's use of the incorrect projection was not "conditioned" on anything. While the communications described in these UMFs took place, Segal included no conditions in its presentation, and in fact repeatedly assured the City's CFO that they could be relied on at the February 15, 2019 meeting. (AMF G) | **UNDISPUTED**. *See* Resolution of Segal UMF 25. Item 28 describes the text of the cited exhibit and does not purport to describe discussions held on February 15, 2019. |

| Per Segal | Per The City | RESOLUTION |
|---|---|---|
| Segal further described the alternative course, writing that "[i]f we are going to set rates at something less than the fully insured proposal, we may need to take the time to do a more-refined projection using fresh claims experience and enrollment…" Id. (emphasis supplied). | | |
| **29.** Mr. Saiz admitted that, based on Segal's February 11, 2019 email, he understood that if the City wanted to increase contribution rates by less than the amount of the fully-insured rate proposal, the City would need a new claims projection. See Ex. 6, Saiz Tr. at 72:10-73:2. | Undisputed.  [Doc. 95, p. 2]. | **UNDISPUTED.** |
| **30.** On Friday, February 15, 2019, Mr. Bhakta, Mr. Saiz and Mr. Petersen met to discuss the City's potential transition to a self-funded arrangement. See id. at 70:2-10, 89:11-16; see also Ex. 4 at Interrog. No. 1. During the meeting, Mr. Petersen advised Mr. Bhakta and Mr. Saiz again that the projected claim expenses reflected in the Summary of Cost Analysis were only "proxies" or "placeholder[s]." See Ex. 6, Saiz Tr. at 93:16-21. Mr. Petersen reiterated during the meeting that, if the City chose to transition to self-funding, the City should set contribution rates at the amount of the fully-insured rate proposal. See id. at 91:17-22; see also Ex. 9, | Inconsistent responses by the City:  Undisputed.  [Doc. 95, p. 2].]; *but see* [Doc. 95, p. 4]: The meeting described took place, but Segal has listed the attendees incorrectly. Nura Patani, the actuary replacing Gary Peterson as the primary consultant, also attended the meeting. (Bhakta Tr. at 114:22-25; AMF G) | **UNDISPUTED.** The additional fact that Nura Patani attended the meeting does not contradict any statement in Segal 30. |

| Per Segal | Per The City | RESOLUTION |
|---|---|---|
| Petersen Tr. at 18:12-25. He also reiterated during the meeting that, if a contribution rate increase less than the fully-insured proposal was to be established, a more refined claim projection using fresh claims experience should be performed. See Ex. 6, Saiz Tr. at 92:1-6. | | |
| 31. On February 13, 2019—two days after Segal's February 11, 2019 email discussing the need to increase contribution rates by the fully-insured proposal—Mr. Saiz sent to Segal's health benefits analytics manager, Carole Henry, a spreadsheet modeling potential contribution rate increases of 8%, 10% and 15%. See Ex. 13, February 13, 2019 Email from Mark Saiz to Carole Henry at 2. | Undisputed.  [Doc. 95, p. 2]. | **UNDISPUTED**. |
| 32. The lowest contribution rate increase that Mr. Saiz modeled in the spreadsheet was 8%, which was consistent with Segal's advice to increase contributions by the fully-insured proposal. See id.; Ex. 6, Saiz Tr. at 79:10-14. | Undisputed.  [Doc. 95, p. 2]. | **UNDISPUTED**. |
| 33. Carole Henry responded to Mr. Saiz two hours later, stating that his spreadsheet "appear[ed] to fall in line with expectations." Ex. 14, February 13, 2019 Email from Carole Henry to Mark Saiz at 1. Ms. Henry added the following note to a | Undisputed.  [Doc. 95, p. 2]. | **UNDISPUTED**. |

| Per Segal | Per The City | RESOLUTION |
|---|---|---|
| revised version of Mr. Saiz's spreadsheet that she attached to her email: "Mark: Presbyterian recommended an 8.7% fully insured renewal for July 1, 2019 – 6/30/2020." Id. at 2. | | |
| **34.** After the February 15, 2019 meeting , Mr. Petersen asked Mr. Saiz if the City would like Segal to prepare updated claims projections. See Ex. 9, Petersen Tr. at 19:20-20:3. | Undisputed.  [Doc. 95, p. 2]. | **UNDISPUTED**. |
| **35.** The City admitted that it never asked Segal to update the claims projection. See Ex. 6, Saiz Tr. at 72:10-73:12; Ex. 10, Plaintiff's Responses to Segal's First Set of Requests for Admissions at RFA No. 3. | Undisputed.  [Doc. 95, p. 2]. | **UNDISPUTED**. |
| **36.** The City internally modeled contribution rate increases of 8% or more for more than three weeks after receiving Segal's February 11, 2019 email. See Ex. 15, February 15, 2019 Email from Mark Saiz to Sanjay Bhakta at COA00090314; Ex. 16, February 28, 2019 Email from Mark Saiz to Sanjay Bhakta at COA00098852; Ex. 17, March 7, 2019 Email from Tim Rivera to Susan Timmerman and Tanya Gallegos at COA00105872. | Undisputed.  [Doc. 95, p. 2]. | **UNDISPUTED**. |
| **37.** The City never shared with Segal the City's subsequent internal models of contribution rate increases (Exs. 15, 16, and 17). See Ex. 6, Saiz. Tr. at 101:5-20. | Undisputed.  [Doc. 95, p. 2]. | **UNDISPUTED**. |

| Per Segal | Per The City | RESOLUTION |
|---|---|---|
| **38.** In February and March 2019, the City never asked Segal to prepare a projection of the end of year reserve for FY2020. See id. at 82:1-5. | Undisputed.  [Doc. 95, p. 2]. | **UNDISPUTED**. |
| **39.** On March 4, 2019, in response to a request by the City, Segal calculated and provided to the City the dollar amount that employees would contribute to the City's health plan based on an 8% contribution rate increase. See Ex. 18, March 4, 2019 Email from Carole Henry to the City's Tim Rivera at 2; Ex. 19, Rivera Tr. at 112:9-22. | Undisputed.  [Doc. 95, p. 2]. | **UNDISPUTED**. |
| **40.** By mid-March 2019, it was "crunch time" for the submission of the City's budget, which was due on April 1, 2019. See Ex. 7, Bhakta Tr. at 139:4-140:24. | Undisputed.  [Doc. 95, p. 2]. | **UNDISPUTED**. |
| **41.** Mr. Bhakta admitted that had no prior experience setting contribution rates or reserve levels for a self-funded health plan. See id. at 8:24-9:23. | Undisputed.  [Doc. 95, p. 2]. | **UNDISPUTED**. |
| **42.** Mr. Bhakta described the February 15, 2019 meeting with Mr. Peterson as a "self-insurance 101" educational session for him. Id. at 193:24-194:14. | Undisputed.  [Doc. 95, p. 2]. | **UNDISPUTED**. |
| **43.** Mr. Saiz was on vacation when Mr. Bhakta needed to decide the contribution rate increase. See Ex. 6, Saiz Tr. at 103:3-104:23; Ex. 7, Bhakta Tr. at 139:4-140:24; Ex. 19, Rivera Tr. at 123:3-124:1. | Undisputed.  [Doc. 95, p. 2]. | **UNDISPUTED**. |

34

| Per Segal | Per The City | RESOLUTION |
|---|---|---|
| **44.** On March 13, 2019, Mr. Bhakta for the first time requested that City personnel model a 3.5% contribution rate increase. See Ex. 6, Saiz Tr. at 103:3-23, 115:14-21. | Undisputed. [Doc. 95, p. 2]. | **UNDISPUTED.** |
| **45.** Given the April 1, 2019 deadline for submitting the budget to the City Council, Mr. Bhakta could not wait for Mr. Saiz to come back to the office from vacation to prepare the model. See Ex. 7, Bhakta Tr. at 139:4-140:12. | Undisputed. [Doc. 95, p. 2]. | **UNDISPUTED.** |
| **46.** On March 13, 2019, Mr. Rivera modeled the projected reserve amount that the City would have at the end of FY2020 if the City increased contribution rates by 3.5%. See Ex. 20, May 21, 2019 Email from Mark Saiz to Nura Patani at COA00000312. Mr. Rivera's model indicated that the City would have a reserve of approximately $5.9 million if it increased the contribution rate by 3.5%. Id. Mr. Bhakta was "comfortable" with a $5.9 million reserve target, at the end of FY2020. See Ex. 4 at Interrog. No. 3. | Undisputed. [Doc. 95, p. 2]. | **UNDISPUTED.** |
| **47.** Mr. Saiz spoke with Mr. Bhakta regarding the 3.5% model and discussed that, if the City increased contributions by only 3.5% for fiscal year 2020, "we can do a various increase next year to put even more money into the reserve to build it up." See Ex. 6, Saiz Tr. at 104:25- 105:7, 114:14-115:7. | Undisputed. [Doc. 95, p. 2]. | **UNDISPUTED.** |

| Per Segal | Per The City | RESOLUTION |
|---|---|---|
| | Mr. Saiz and Mr. Bhakta continued to use the $4.6M projection to model contribution increases even after they learned that the projection did not include the cost of all of the prescription drugs because they understood that the $4.6M cost was the lion's share of the drug claims "because the compound, the specialty, the over-the-counter, as I understand, [were a] very small percentage of the overall cost." (Ex. N, Saiz Tr. at 140:11-16) The ESI proposal as Mr. Saiz understood it was a $9.6 million gross cost with a $4.3 million rebate to get to the $4.6 million amount. (Id. at 140:23-141:1) | |
| **48.** Mr. Saiz admitted that he allowed Mr. Bhakta to rely on a model using the $4,600,600 projection for prescription drug costs even though he knew that the $4,600,600 did not include the cost of all of the prescription drug claims. See id. at 139:16-140:10. | | **UNDISPUTED**. The City's response offers additional factual statements that do not contradict the statements made in Segal 48. |
| **49.** When considering potential contribution rate increases, Mr. Bhakta wanted to "make sure" that the health plan was "not in the red at the end of first year." Id. at 103:15-105:13. | Undisputed.  [Doc. 95, p. 2]. | **UNDISPUTED**. |
| **50.** In setting the contribution rate, Mr. Bhakta also considered that "at some point" the City should build a reserve of two months' expenses. Id. Mr. Bhakta aimed to build the reserve over a three- to four-year time period. Id. | Undisputed.  [Doc. 95, p. 2]. | **UNDISPUTED**. |
| **51.** Mr. Bhakta's decision to increase contribution rates by 3.5% was a budgetary decision that reflected his consideration of various factors. Mr. Bhakta | Undisputed.  [Doc. 95, p. 2]. | **UNDISPUTED**. |

| Per Segal | Per The City | RESOLUTION |
|---|---|---|
| considered (i) the "effect of any [] increases on employees," including the financial impact on employees "in light of the [City's] cost of living adjustment," and (ii) the "effect[] [of the increase] on the other participating entities and their employees." See Ex. 4 at Interrog. No. 3; Ex. 7, Bhakta Tr. at 98:12-101:1. | | |
| **52.** In setting the contribution rate, Mr. Bhakta also considered the financial needs of other City departments. See id. The City funds 80% of the total contributions to the Plan. See Ex. 21, Plaintiff's Responses to Segal's Second Set of Requests for Admissions at RFA Nos. 14, 15.  As a result, Mr. Bhakta considered the amount of the City's financial contribution in light of other City budgetary needs. See Ex. 7, Bhakta Tr. at 98:12-101:01. | Undisputed.  [Doc. 95, p. 2]. | **UNDISPUTED**. |
| **53.** The City admitted that it did not follow Segal's recommendations to increase contributions by 8% or more. Ex. 10, Plaintiff's Responses to Segal's First Set of Requests for Admissions at RFA No. 7. | Undisputed.  [Doc. 95, p. 2]. | **UNDISPUTED**. |
| **54.** The City did not ask Segal to review its internal model of a 3.5% contribution rate increase FY2020 before the City announced the increase to employees. See Ex. 10, | Undisputed.  [Doc. 95, p. 2]. | **UNDISPUTED**. |

| Per Segal | Per The City | RESOLUTION |
|---|---|---|
| Plaintiff's Responses to Segal's First Set of Requests for Admissions at RFA No. 11. | | |
| **55.** Mr. Bhakta admitted that he did not go back to and ask the experts at Segal whether a 3.5% increase was appropriate because: …the staff at the benefits bureau, they agreed that if we do 3.5% it will generate a reserve at the end of the year and that was sufficient. I already knew Segal recommended more, but that, that has to do with building the reserves, you know, more than kind of necessary or, you know, it would be a very, very conservative percentage in my opinion.  See Ex. 7, Bhakta Tr. at 101:2-16 (emphasis supplied). | Undisputed.  [Doc. 95, p. 2]. | **UNDISPUTED.** |
| **56.** Mr. Saiz admitted that, in discussing the potential 3.5% increase with Mr. Bhakta, he never reminded Mr. Bhakta that Segal had recommended that the City an obtain updated cost projection if it sought to increase the contribution rate by an amount less than 8%. See Ex. 6, Saiz Tr. at 115:14-116:3. | Undisputed.  [Doc. 95, p. 2]. | **UNDISPUTED.** |
| **57.** On March 29, 2019, the City advised other employers that participate in the Plan that the City was transitioning to a self-funded plan and increasing the contribution rate by 3.5%. See Ex. 22, | Undisputed.  [Doc. 95, p. 2]. | **UNDISPUTED.** |

| Per Segal | Per The City | RESOLUTION |
|---|---|---|
| April 1, 2019 Email from Linda Garza to Mark Saiz and Tim Rivera at COA00091543. | | |
| **58.** On April 16, 2019, the City announced to City employees that it was transitioning to a self-funded health plan and increasing contribution rates by 3.5%. See Ex. 23, April 16, 2019 Interoffice Memorandum at SEGAL_00006743. | Undisputed.  [Doc. 95, p. 2]. | **UNDISPUTED**. |
| **59.** In October 2020, Mr. Saiz and Mr. Bhakta prepared responses to the City Council's Committee as a Whole regarding the self-funded health plan. Ex. 24, September 25, 2020 Email from Mark Saiz to Sanjay Bhakta at COA00090053. In the response, the City officials admitted that the "transition from fully insured to self-funded was completely successful" and that "[t]he cost for medical and prescription care was in line with anticipated projections, fluctuations and trends." Ex. 25, October 1, 2020 Interoffice Memorandum to the Committee as a Whole at COA000104381. | Undisputed.  [Doc. 95, p. 2]. | **UNDISPUTED**. |
| **60.** Mr. Bhakta and Mr. Saiz explained that the "[t]he cost for medical and prescription care [for FY2020] was in line with anticipated projections, fluctuations and trends" because the "combined" or "overall" | Undisputed.  [Doc. 95, p. 2]. | **UNDISPUTED**. |

| Per Segal | Per The City | RESOLUTION |
|---|---|---|
| costs of medical claims, prescription drug claims, and other expenses fell within "the combined projection, where we should have been combined." See Ex. 6, Saiz Tr. at 186:6-187:16; Ex. 7, Bhakta Tr. at 162:20-163:8. | | |
| **61.** By its own account, the City saved at least $8 million in FY2020 alone by transitioning to a self-funded arrangement. See Ex. 25 at October 1, 2020 Interoffice Memorandum to the Committee as a Whole at COA000104381. | Undisputed. [Doc. 95, p. 2]. | **UNDISPUTED**. |
| **62.** The City's current consultant, McGriff Seibel & Williams ("McGriff"), determined that, through February 8, 2021, that City saved approximately $12.495 million by transitioning to a self-funded plan. See Ex. 26, McGriff City of Albuquerque Claims Overview at 2. | Undisputed. [Doc. 95, p. 2]. | **UNDISPUTED**. |
| **63.** For FY2020, the City budgeted $78,098,000 in combined expenses (including medical claims, prescription drug claims, and other expenses) for its health plan. See Ex. 27, City of Albuquerque Website at CABQ Website 000496. | Undisputed. [Doc. 95, p. 2]. | **UNDISPUTED**. |
| **64.** The City's actual expenses for FY2020 were $72,124,772, which was $5,973,228 less than the City budgeted. See id. | Undisputed. [Doc. 95, p. 2]. | **UNDISPUTED**. |
| **65.** The City budgeted a $5.9 million end of year reserve | Undisputed. [Doc. 95, p. 2]. | **UNDISPUTED**. |

| Per Segal | Per The City | RESOLUTION |
|---|---|---|
| for its health plan for FY2020. See Ex. 4 at Interrog. Nos. 4, 8; Ex. 27, City of Albuquerque Website at CABQ Website 000496. | | |
| **66.** The City's audited financial statements for FY2020 confirm that the City achieved an end of year reserve of over $6.9 million—$1 million more than the City had budgeted. Id. | Undisputed.  [Doc. 95, p. 2]. | **UNDISPUTED**. |
| **67.** Mr. Bhakta admitted that he could only speculate regarding how much he may have increased contributions if he had been provided a higher projection of prescription drug claims. See Ex. 7, Bhakta Tr. at 209:12-210:18. | This UMF misstates Mr. Bhakta's testimony. Mr. Bhakta's testimony was that if he had been "provided different data[] reflecting higher prescription costs," he would have been "required" to increase premiums. (Bhakta Tr. at 209:17-210:1) When Segal's attorney asked for speculation, Mr. Bhakta declined to speculate. (Id. at 210:14-18) | **UNDISPUTED**. The topic of Segal 67 is the amount, not the requirement, of a higher contribution rate; as to that amount, the City does not dispute that it would depend upon higher claims projection that were not provided and, thus, would be speculative. |
| **68.** The City has claimed that the "difference in the amount of premium collected from what would have been collected if Segal had provided the correct data and the City used the same reserve goal is $5,645,518." Ex. 4 at Interrog. No. 8. | Undisputed.  [Doc. 95, p. 2]. | **UNDISPUTED**. |
| **69. Mr**. Saiz prepared a chart showing that if the City had been provided in February 2019 a higher projection for prescription drug claims for FY2020, the City would have targeted an 11% contribution increase to (a) | It is not true the City would have "targeted an 11% contribution increase" had it been given accurate projections. Mr. Saiz prepared the chart to determine an after the fact "guesstimate" of what rate increase would have been | Disputed. |

| Per Segal | Per The City | RESOLUTION |
|---|---|---|
| collect $5,645,518 more in premium and (b) seek an end-of-year reserve of approximately $6.4 million. See Ex. 6, Saiz Tr. at 217:24-218:25, 219:15-221:3; Ex. 28, Projected Cost Spreadsheet. | needed if the City had been provided the correct data and wanted to target a similar reserve to $5.9M for FY20. (Saiz Tr. at 218:11-221:3) But the CFO's rationale for limiting the rate increase to 3.5% would have remained unchanged—that rate appeared to provide adequate reserves while allowing the remaining money to be spent on other areas. (Bhakta Tr. at 98:23-101:1) | |
| **70.** Mr. Bhatka admitted that an 11% contribution rate increase would not have been adopted – he described that a 10% increase would have been "unacceptable." See Ex. 7, Bhakta Tr. at 98:12-101:1. | Undisputed.  [Doc. 95, p. 2]. | **UNDISPUTED.** |
| **71.** Mr. Bhakta further admitted that he did not know if he would have wanted the City to contribute an additional $3.5 million to the Plan for FY2020. See Ex. 7, Bhakta Tr.at 41:19- 42:23. | Undisputed.  [Doc. 95, p. 2]. | **UNDISPUTED.** |
| **72.** The City's FY2020 end of year reserve of $6.9 million was higher than the $6.4 million projection prepared by Mr. Saiz. See Ex. 27 at CABQ Website 000496. | Undisputed.  [Doc. 95, p. 2]. | **UNDISPUTED.** |
| **73.** Mr. Saiz admitted in December 2020 that the City's reserve amount "look[ed] good." Ex. 29, December 17, 2020 Email from McGriff consultant, Scott Gibbs, to Mark Saiz. | Segal's incomplete quote is misleading. The full quote is "Bottom line—our reserve does look good, but we need to be conservative/cautious until we (and the world) are operating at 100%. Meaning, the pent-up demand is real and will hit us over the next year." (MSJ Ex. 29) | **UNDISPUTED.** The City's response provides additional context but does not negate Saiz's primary statement. |

| Per Segal | Per The City | RESOLUTION |
|---|---|---|
| **74.** McGriff described that when it took over from Segal at the end of calendar year 2020, the City was "over reserved." See Ex. 30, McGriff Tr. at 66:22-71:4, 71:17-20, 114:8-116:15; see also Ex. 26, McGriff City of Albuquerque Claims Overview at 2. | This UMF states that McGriff determined that the City was "overreserved" at the time McGriff took over from Segal. However, the McGriff Transcript and Exhibit 26 provided by Segal show that at the end of calendar year 2020 the City was above a targeted reserve. (MSJ Ex. 26) | |
| **75.** Mr. Bhakta admitted that the City did not want to over reserve and thereafter put in extra dollars to the health fund if not needed. See Ex. 7, Bhakta Tr. at 180:10-181:12. | Undisputed.  [Doc. 95, p. 2]. | **UNDISPUTED.** |
| **76.** The City's audited financial statements for FY2021 confirm that the $6.9 million reserve from FY2020 has increased by another $2.3 million in FY2021 and totaled $9.2 million. See Ex. 31 at CABQ Website 000496; See Ex. 7, Bhakta Tr. at 63:24-65:1. | Undisputed.  [Doc. 95, p. 2]. | **UNDISPUTED.** |
| **77.** At the end of calendar year 2020, Mr. Bhakta rejected Segal's recommendation to increase contribution rates for FY2022 by 5.8%. See Ex. 32, December 16, 2020 Email from Nura Patani to Mark Saiz at SEGAL_00008103; Ex. 6, Saiz Tr. at 198:6-199:6, 203:3-204-10. | Undisputed.  [Doc. 95, p. 2]. | **UNDISPUTED.** |
| **78.** Mr. Bhakta instead approved a 3.5% contribution rate increase knowing that (1) the contributions based on a | Undisputed.  [Doc. 95, p. 2]. | **UNDISPUTED.** |

| Per Segal | Per The City | RESOLUTION |
|---|---|---|
| 3.5% increase would not cover the projected claims and expenses for the year; and (2) he intentionally would be reducing the reserve amount the City had built up during the period that Segal had provided services to the City. See Ex. 7, Bhakta Tr. at 74:15-76:23. | | |
| City AUMF ¶ A: Other than the first sentence, AUMF ¶ A does not set forth statements of fact, but rather states opinions of the City's expert or legal conclusions. The Rebuttal Expert Report of Kathleen A. Riley, FSA, MAAA, EA, Dkt. 99-4, disputes Mr. DeWeese's opinions. | **A**. Segal advised the City on the decision of whether to switch its health benefits plan from a fully-insured to a self-insured plan. (Compl. ¶ 8; Ex. C, Ward Tr. at 37:16-20; Ex. D, Sherman Tr. at 17) In performing these consulting services, Segal had a duty to base its recommendations on correct data and to take into consideration any limitations in that data. Segal also had a duty to communicate its recommendations appropriately given the circumstances and the intended users. Finally, it had a duty to use appropriate internal review procedures to ensure the accuracy of its recommendations. (Ex. E, DeWeese Report at 8-9). | **The first sentence is undisputed**. The remaining sentences are conclusions of law and therefore not adopted as undisputed facts. |
| City AUMF ¶ B: The "purpose" of the Summary was to guide a discussion regarding whether the City should transition from a fully insured to a self-funded arrangement. See Segal MSJ UMF ¶¶ 23, 42 (both undisputed). The Summary was not created for the | **B**. On Feb. 11, 2019, Segal provided the City with a "Summary of Cost Analysis for Effective Dates of July 1, 2019 – June 30, 2020." (Ex. A) The purpose of the Summary was to compare the value of going self-funded to remaining fully insured for FY20. (Ex. C, Ward | **UNDISPUTED**. Although the phrase "to compare the value" can imply different uses of the Summary, it is not an unfair description of the same purpose described by Segal. Segal's limitation ("not created for the purpose of |

44

| Per Segal | Per The City | RESOLUTION |
|---|---|---|
| purpose of the City setting a budget. See Segal MSJ UMF ¶¶ 23, 24, 26, 29, and 30 (all undisputed). | Tr. at 59:19-25, 73:7-12) | … setting a budget") is acknowledged:  the Court found each of the supporting UMFs to be undisputed. |
| City AUMF ¶ C: AUMF ¶ C quotes only parts of the Summary and excludes the portion in which Segal expressly disclosed that the $4,600,600 prescription drug cost was taken directly from Segal's PBM RFP Analysis. See Dkt. 86-11 at SEGAL_00001171 n. 2. Segal similarly had informed the City that the Summary used the prescription drug data from its PBM RFP Analysis in its February 8, 2019 and February 11, 2019 emails. See id. at SEGAL_00001170; Dkt. 86-12 at SEGAL_00008657. The PBM RFP Analysis expressly described that the projections did not include the cost of certain categories of drug claims. See Dkt. 86-5 at 7. Segal also informed the City on February 8, 2019 that the prescription drug data from the PBM RFP analysis was being used in the Summary as a "proxy." Segal MSJ UMF ¶¶ 23, 24 (both undisputed). | **C**. The Summary projected that the FY20 prescription claims costs would be $4,600,600 net of rebates under the self-funded plan and $10,891,238 under the fully insured arrangement, a difference of over $6.2M. (Ex. A at 2) It projected a total savings of about $8.8M under the self-funded plan. (Id.) | Disputed both as to the derivation of the $4.6 million figure and its "proxy" character. |
| City AUMF ¶ D: In the PBM RFP Analysis, Segal performed an independent projection to calculate the $4,600,600 for the purposes of the selection of a PBM. See Dkt. 86-5 at 7. On | **D**. Segal had not performed an independent projection to calculate the $4,600,600 number included in the Summary, but instead had simply recycled the number it had computed related to ESI in its comparison of the PBM | **UNDISPUTED EXCEPT** for the characterization that "the $4.6M number was based on old data.  The City's other statements are suggestive of impropriety (e.g., "simply recycled") |

45

| Per Segal | Per The City | RESOLUTION |
|---|---|---|
| February 8, 2019, Segal disclosed to the City that it would use the $4,600,600 in the Summary as a "proxy" for the City's self-funded prescription drug costs because there was insufficient time to prepare an updated projection. Dkt. 86-12 at SEGAL_00008657. Mr. Saiz agreed with Segal's approach, responding "[y]es - that's fine." Id.  Mr. Saiz knew that Segal provided the Summary using the RFP data as a proxy "only because" Segal understood that the City would be increasing the contribution rates by the amount of the fully insured rate proposal. See Segal MSJ UMF ¶ 26 (undisputed). Segal's February 11, 2019 email reiterated that the Summary included the data from the PBM RFP Analysis. See Dkt. 86-11 at SEGAL_00001170. The Summary also expressly identified that the $4,600,600 was taken from Segal's PBM RFP Analysis. See Segal Resp. to City AUMF ¶ C. The City's expert conceded that, contrary to his report, the $4,600,600 was not based on old data. See Dkt. 93-2. | bids. (Ex. A at 1) But it had previously removed certain claims costs, such as specialty drugs, from that number. (Ex. B. at 7) In recycling the number, it did not add back the previously removed costs, nor did it adjust the number to account for the fact that the $4.6M number was based on old data. (Ex. D, Sherman Tr. at 88-89; Ex. E, DeWeese Report at 4.) | but are not factually inaccurate. |
| City AUMF ¶ E: Mr. Petersen and Ms. Patani did not testify that Segal's internal review process "was not followed with respect to the Summary." Mr. Petersen and Ms. Patani testified that they assumed that the data in | **E.** Although Segal had an internal review process that required at least three people to look at work product before it was given to a client, (Ex. D, Sherman Tr. at 65:2-9; Ex. F, Henry Tr. at 33:16-35:9) that process was not followed with | Disputed. |

| Per Segal | Per The City | RESOLUTION |
|---|---|---|
| the Summary went through Segal's internal review process. See Dkt. 94-7 at 77:5-11; Dkt. 94-8 at 27:17-20. | respect to the Summary. (Ex. G, Petersen Tr. at 77:5-11; Ex. H, Patani Tr. at 25:20-23). | |
| City AUMF ¶ F: Limitations, warnings and disclaimers were contained in the February 11, 2019 email that Segal sent when it provided the Summary as an email attachment. Dkt. 86-11 at SEGAL_00001170. On February 15, 2019, Segal warned the City that (i) the projected claim expenses were only "proxies," (ii) if the City chose to transition to self-funding, the City should set contribution rates at the amount of the fully-insured proposal; and (iii) if a contribution rate increase less than the fully-insured proposal was to be established, a more refined claim projection using fresh claims experience should be performed. See Segal MSJ UMF ¶ 30 (undisputed). The Summary was not created for the purpose of setting a budget. See Segal Resp. to City AUMF ¶ B. Segal told the City that the City should use the fully insured rates for budgeting or alternatively obtain an updated costs projections when Segal (i) agreed to prepare the Summary, (ii) provided the Summary to the City and (iii) discussed the Summary with the City. See Segal MSJ UMF ¶¶ 26, | F. The Summary did not contain any disclaimers, warnings, or limitations as to what the projected expenses in it could be used for. (See Ex. B) Claims costs for self-insured and fully-insured were the same so Mark Saiz asked Gary Peterson what explained the difference on the Summary. Peterson explained it was because Presbyterian was keeping $6M in rebates. (Ex. N, Saiz Tr. at 74:12 -76:1) | The first sentence is disputed; Segal's position is that the cover email is a material part of the Summary, and that Segal provided additional limitations in ensuing discussions before the City made its decisions.

The second and third sentences are factually distinct from the first; their implication that the only material distinction between self-insured and fully-insured claims costs was "because Presbyterian was keeping $6M in rebates" is disputed. |

47

| Per Segal | Per The City | RESOLUTION |
|---|---|---|
| 29, and 30 (all undisputed). Segal incorporates its response to City AUMF ¶ G.<br><br>City AUMF ¶ G: The City selectively cites the record. During the February 15, 2019 meeting, Segal advised that (i) the projected claim expenses reflected in the Summary were only "proxies" or placeholder[s]," (ii) if the City chose to transition to self-funding, the City should set contribution rates at the amount of the fully-insured proposal; and (iii) if a contribution rate increase less than the fully-insured proposal was to be established, a more refined claim projection using fresh claims experience should be performed. See Segal MSJ UMF ¶ 30 (undisputed). | **G**. On February 15, 2019, Segal employees Peterson and Patani met with Mr. Bhakta and Mr. Saiz to explain the Summary. Mr. Bhakta asked Segal about the large difference between prescription costs for insured versus self-insured and asked how the self-insured costs could be so low. (Ex. I, Bhakta Tr. at 116:15-21, 200:16-201:4) Segal responded that the difference was explained by the fact that under the self-insured plan, the City would be getting the rebates. (Id. at 117:1-6; 200:23-201:4) | **UNDISPUTED**. Segal's response adds additional factual statements that may be necessary context to limit the import of Bhakta's testimony about what Segal said, but Segal does not contradict the City's description of Bhakta's testimony. |
| City AUMF ¶ H: The City knew that the $4,600,600 was not the "correct" figure to use for purposes of setting a contribution rate less than 8%. See Segal MSJ UMF ¶ 29 (undisputed).   The City mischaracterizes Ms. Henry's testimony. She testified that the use of the term "projection" in an internal email was "sloppy." See Dkt. 99-5 at 133:12-134:16. After the February 15, 2019 meeting, the City rejected Segal's offer to prepare new claims projections. See Segal MSJ UMF ¶¶ 34, 35 (both undisputed). When Mr. Saiz raised a question in August | **H**. As Segal now admits, the $4.6M projection was incorrect: (Answer ¶ 31; see also id. ¶ 34; Ex. D, Sherman Tr. at 45:3-14; 89:5-7; Ex. C, Ward Tr. at 25:17-22, 74:18-75:4; Ex. J, 2/10/20 Patani Email (describing the $4.6M number as understated)) Segal's employees called the Summary "sloppy." (Ex. F, Henry Tr. at 134)  In a January 27, 2020 email, Ms. Patani, the lead consultant to the City, expressed "frustration" about the projections she and Mr. Petersen had presented to the City, instructing her team to "be careful about how we talk about things our predecessors did that we might have done | Disputed. |

| Per Segal | Per The City | RESOLUTION |
|---|---|---|
| 2019 regarding the prescription drug claim experience, Segal provided to the City in September 2019 a cost projection on a cash flow basis. See Dkt 94-13; Dkt. 99-6 at 62:17-63:13. | differently ... ." (Ex. K, 1/27/20 Patani Email). Segal also maintains that it had no duty to warn the City of its inaccurate data, or to review the data for accuracy because the City did not specifically contract and pay Segal to warn the City of Segal's own ineptitude. (Ex. F, Henry Tr. at 138:5-21) And when Mark Saiz later questioned the accuracy of the Segal projection in August 2019, Segal did not advise the City of its inaccurate projection. (Ex. P, M. Saiz 2/5/20 Email) | |
| City AUMF ¶ I: The City's blanket characterization of the $4,600,600 estimate as "incorrect" is inaccurate. See Segal Resp. to AUMF ¶ H. The City knew that the $4,600,600 excluded certain categories of prescription drug claims, see Segal MSJ UMF ¶¶ 11, 12 (both undisputed), and was only a "proxy," see Segal MSJ UMF ¶¶ 24, 30 (both undisputed). The City also knew that Segal recommended that the City use the fully insured rates for budgeting or alternatively obtain new projections. See Segal MSJ UMF ¶¶ 26, 29, and 30 (all undisputed). Further, the City knew the projected prescription drug rebates were $4,358,800, not $6 million. See Opp. p.2 at City Resp. to Segal UMF ¶¶ 13 and 48; Dkt. 99-2 at 138:15-141:1. | **I**. The most important factor in the City's decision to change to self-insured was the savings attributable to prescription claims, which was based on the incorrect $4.6M estimate in the Summary. (Ex. I, Bhakta Tr. at 31:2-18, 198:5-9, 201; Ex. L, Rivera Tr. at 92) | Disputed. |

| Per Segal | Per The City | RESOLUTION |
|---|---|---|
| | **J**. Subsequently, in September 2019, Segal provided a revised set of projections to the City for FY20.3 The revised projections estimated the prescription costs for FY20 at $12,814,269 with rebates of $2,179,400, for a total of $10,634,869 net of rebates. (Ex. M, FY20-22 Projection) This estimate was $6,034,269 more than the $4.6M projected prescription costs for FY20 in February 2019. | Disputed. Although the (at least) four independent factual statements in AUMF ¶ J may individually be accurate, their collective import, that the revised projections show that the "proxy" number was misleading, is disputed. |
| City AUMF ¶ J: In September 2019, Segal provided the City with a cost projection on a cash flow basis. See Dkt. 94-13; Dkt. 99-6 at 62:17-63:13. The Summary was prepared on a different basis, i.e., when claims and other costs were incurred, see Dkt. 99-7 at 114:10-19. | | |
| City AUMF ¶ K: The City's blanket characterization of the $4,600,600 cost estimate as "incorrect" is inaccurate. See Segal Resp. to City AUMF ¶ H. The City did not ask Segal to verify a budget based on a 3.5% increase. See Segal MSJ UMF ¶ 54 (undisputed). | **K**. The City used Segal's incorrect $4.6M projection to develop the cost premium projections to arrive at a 3.5% premium increase for FY20. (Ex. L, Rivera Tr. at 91:17-18.) The City verified that budget with Segal. (Ex. I, Bhakta Tr. at 223:20-24). | Disputed. |
| City AUMF ¶ M: The City's blanket characterization of the $4,600,600 cost estimate as "incorrect" is inaccurate. See id. The City's claim that Mr. Bhakta may not have recommended that the City transition to a self-funded arrangement is speculation. See Dkt. 94-9 at 31:3-4. The City's statement that it "set the premium at a lower rate than it would have" is also speculation as Mr. Bhakta testified that his decision to implement a 3.5% contribution rate increase for FY2020 was influenced by multiple factors. See Segal MSJ UMF ¶ 51 (undisputed). | **M**. But for the incorrect estimate, the City might never have chosen to self-insure. (Ex. I, Bhakta Tr. at 31:3-6) As a result of the incorrect estimate, the City set the premium increase for the initial fiscal year at a lower rate than it would have if it had the correct data, resulting in collection of less premium. | Disputed. |

50

| Per Segal | Per The City | RESOLUTION |
|---|---|---|
| City AUMF ¶ N: The City's claim that it "would likely have" raised premiums by 7% or more is speculation. Mr. Bhakta testified that he could not identify an amount by which the City would have increased contributions. See Dkt. 94-9 at 201:14-18. | **N**. If the City had been provided the correct data it would likely have raised the premium by at least 7% which would have resulted in additional monies in the reserve at the end of FY20. (Id. at 210:19-22) | Disputed. |
| City AUMF ¶ O: The statement that the City "had to raise premiums more than it would have been required to in the subsequent years" is speculation. The cited portions of Mr. DeWeese's Report and Mr. Bhakta's testimony do not identify the amount that the City "would have been required to" raise rates. Mr. Bhakta testified that his decisions on contribution rate increases were influenced by multiple factors. See Segal MSJ UMF ¶ 51 (undisputed). Also, the City's health plan ended up "over-reserved," and the City intentionally decided to implement lower contribution rate increases and reduce the amount of the reserve. See Segal MSJ UMF ¶ 74 (disputed in part). | **O**. Because the City had set premiums according to inaccurate data, and had less in reserve as a consequence, it had to raise premiums more than it would have been required to in the subsequent years. (Ex. E, DeWeese Report at 9-10; Ex. I, Bhakta Tr. at 206-08, see also Ex. O, 3/13/19 email from T. Rivera to S. Bhakta) | Disputed. |
| City AUMF ¶ P: Segal incorporates by reference its responses to AUMF ¶¶ M, N and O. | **P**. Had the $4.6M number been correct, the City would have been able to use the approximately $6M per year in extra funds to build its reserve and would have had the ability to avoid increasing the premiums. (Ex. I, Bhakta Tr. at 206-208, 36:12-37:4; 52:21-23). It could also have used | Disputed. |

51

| Per Segal | Per The City | RESOLUTION |
|---|---|---|
| | that money to fund other programs. (Id. at 98:23-101:1) | |
| City AUMF ¶ Q: The City's statement is a purported expert opinion by an unqualified lay witness. Further, the City would have had a reserve at the end of FY2020 in excess of $2.2 million even if health care costs had not been altered by the pandemic. See Ex. 33, Saiz Tr. 165:17-167:5. | **Q**. The City's FY20 reserve was "saved" by "sheer luck" due to the pandemic because it resulted in reduced demand for medical claims. (Id. at 42:20-23; Saiz Tr. at 186:25-187:3;208:21-209:4) | Disputed. |
| [No Segal response] | **R**. The City relied on Segal to do an analysis of the pharmacies' responses to the RFP for prescription drugs because the City (i.e. Mark Saiz) did not have the subject matter expertise to do that analysis. "You needed a team of pharmacists to review and vet these. That's why we contracted Segal." (Ex N, Saiz Tr. at 172:20-173:2) | **UNDISPUTED**. |